T.C. Memo. 1996-435


UNITED STATES TAX COURT


BARRY B. BEALOR AND NANCY L. BEALOR, ET AL.,[1]
Petitioners <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 13364-89, 14112-89,    Filed September 25, 1996.
            17236-89, 26434-89,
            27614-90, 14819-91,
            14820-91, 22407-91,
            22496-91, 25519-91,
            27125-91,  3453-92,
             3456-92,  3457-92,
             3461-92,  3462-92,
             3551-92,  9950-92,
             3221-93, 10897-93,
            23719-93.

--------------------

[1]Cases of the following petitioners are consolidated herewith:  Frank A. Pettisani and Lucille M. Pettisani, docket No. 14112-89; James D. Cameron and Anita B. Cameron, docket No. 17236-89; Intercoastal Management Co. and Subsidiaries, docket No. 26434-89; Donald P. Crescenzo and Kathleen Crescenzo, docket No. 27614-90; MIT 82, Bryen & Bryen, P.A., Tax Matters Partner, docket No. 14819-91; MIT 83, Bryen & Bryen, P.A., Tax Matters Partner, docket No. 14820-91; MIT 83, Bryen & Bryen, P.A., Tax Matters Partner, docket No. 22407-91; MIT 84, Bryen & Bryen, P.A., Tax Matters Partner, docket No. 22496-91; MIT 85, Bryen & Bryen, P.A., Tax Matters Partner, docket No. 25519-91; Intercoastal Management Co. and Subsidiaries, docket No. 27125-91; MIT 85, Bryen & Bryen, P.A., Tax Matters Partner, docket No. 3453-92; MIT 82, Bryen & Bryen, P.A., Tax Matters Partner, docket No. 3456-92; MIT 80, Bryen & Bryen, P.A., Tax Matters Partner, docket No. 3457-92; MIT 84, Bryen & Bryen, P.A., Tax Matters Partner, docket No. 3461-92; MIT 86, Bryen & Bryen, P.A., Tax Matters Partner, docket No. 3462-92; MIT 83, Bryen & Bryen, P.A., Tax Matters Partner, docket No. 3551-92; MIT 86, Bryen & Bryen, P.A., Tax Matters Partner, docket No. 9950-92; W & A Payroll Service, Bryen & Bryen, P.A., Tax Matters Partner, docket No. 3221-93; W & A Payroll Service, Bryen & Bryen, P.A., Tax Matters Partner, docket No. 10897-93; and Frank A. Pettisani and Lucille M. Pettisani, docket No. 23719-93.

Stephen J. Jozwiak, for petitioners in docket Nos. 13364-89, 14112-89, 17236-89, 26434-89, 27614-90, 22407-91, 22496-91, 25519-91, 27125-91, 9950-92, 10897-93, and 23719-93.

Fred Bryen (an officer), for petitioners in docket Nos. 14819-91, 14820-91, 3453-92, 3456-92, 3457-92, 3461-92, 3462-92, 3551-92, and 3221-93.

John E. Becker, Jr., James C. Fee, Jr., and Joseph M. Abele, for respondent.

## CONTENTS

| Subject | Page |
|---|---|
| Issues............................................. | 7 |
| FINDINGS OF FACT.................................... | 8 |
| Background.......................................... | 9 |
| MIT 80............................................. | 12 |
|     Formation of MIT 80............................ | 12 |
|     Investors in MIT 80............................ | 13 |
|     Organization and Management of MIT 80........... | 13 |
|     MIT 80 Employee Leasing Arrangement............ | 14 |
|     Operation of MIT 80............................ | 17 |
|     Petitioner Crescenzo's Deduction of MIT 80 Partnership Loss............................... | 21 |
|     Post-1980 Transactions of MIT 80............... | 21 |
|     Illustration No. 1............................. | 24 |
|     Purported Transactions--MIT 80................. | 25 |
|     Termination Agreement of MIT 80................ | 26 |
|     Partnership Income of MIT 80................... | 28 |
| MIT 82............................................. | 31 |
|     Formation of MIT 82............................ | 31 |
|     Investors in MIT 82............................ | 31 |
|     Organization and Management of MIT 82........... | 33 |
|     MIT 82 Employee Leasing Agreement.............. | 35 |
|     Operation of MIT 82............................ | 36 |
|     Individual Petitioners' Deductions of Partnership Loss............................... | 39 |

Intercoastal's Deduction of Compensation Fee....... 39
Post-1982 Transactions of MIT 82................... 40
The Pettisanis' Deductions of Interest
  Payments........................................ 41
Illustration No. 2................................. 42
Purported Transactions--MIT 82..................... 42
Termination Agreement of MIT 82.................... 43
Partnership Income of MIT 82....................... 44

MIT 83................................................ 46

MIT 83 Investors................................... 46
Organization and Management of MIT 83.............. 46
MIT 83 Employee Leasing Agreement.................. 50
Operation of MIT 83................................ 51
Tax Deductions..................................... 54
Other Developments................................. 55
Post-1983 Transactions of MIT 83................... 56
Illustration No. 3................................. 57
Investment Program--MIT 83......................... 57
Termination Agreement of MIT 83.................... 60
MIT 83 Income...................................... 60

MIT 84................................................ 61

MIT 85................................................ 68

MIT 86................................................ 75

W & A Payroll Service................................. 82

The Investors......................................... 89

OPINION............................................... 92

I.   Neither the Partners Nor the Partnerships
     Are Entitled to Loss Deductions Based Upon
     Payment of Machise's Payroll Costs .......... 93

     A. The Requirement of Economic Substance...... 93
        1. The Relationship of the Employees
           and Independent Contractors to
           Machise and to the Partnerships....... 95
        2. Lack of Economic Substance of the
           Employee Leasing Agreements........... 103
           a. Structure of the Financing....... 104
           b. Termination Agreements........... 110
           c. Arm's-Length Negotiations........ 115
           d. Adherence to Contractual
              Terms........................... 119
           e. Reasonableness of Income

                    Projections...................... 123
              f. Insertion of Other Entities...... 128
        B. Lack of Profit Objective of the
           Employee Leasing Partnerships.............. 129

II.   The Pettisanis Are Not Entitled to
      Deductions for Interest Claimed on Their
      Long-Term Notes............................... 138

III.  Intercoastal Is Not Entitled To Deduct From
      Its Income the Accrued Interest, Management
      Fees, or Override Payments to the Leasing
      Partnerships.................................. 141

IV.   The Transactions at Issue Are Not
      Recognized for Purposes of Claiming
      Deductions or Reporting Income................ 145
      A. In Summary................................. 145
      B. No Procedural Defense to Determined
         Deficiencies............................... 146
      C. No Need To Address Other Issues............ 151

MEMORANDUM FINDINGS OF FACT AND OPINION

BEGHE, Judge:  In seven of these consolidated cases respondent determined deficiencies in Federal income taxes as follows:

| Docket No. | Petitioners | Taxable Year | Deficiency |
|---|---|---|---|
| 13364-89 | Barry  B. Bealor and Nancy L. Bealor | 1982 | $23,434 |
| 14112-89 | Frank A. Pettisani and Lucille M. Pettisani | 1982 | 12,344 |
| 17236-89 | James D. Cameron and Anita B. Cameron | 1982 | 33,749 |
| 26434-89 | Intercoastal Management Co. and Subsidiaries | 1982<br>1983 | 312,775<br>471,918 |
| 27614-90 | Donald P. Crescenzo and Kathleen Crescenzo | 1980 | 23,903 |
| 27125-91 | Intercoastal Management Co. and Subsidiaries | 1984<br>1985<br>1986 | 644,814<br>670,597<br>725,758 |
| 23719-93 | Frank A. Pettisani[1] and Lucille M. Pettisani | 1983<br>1984<br>1985<br>1986<br>1987 | 270,425<br>606,481<br>1,014,702<br>1,304,694<br>293,682 |

[1] In this case, respondent determined substantial deficiencies and additions to tax arising from petitioners' activities, including investments in various partnerships and S corporations.  The only portions of the deficiencies at issue are those that arise from petitioners' claimed interest expense deductions with respect to their investment in MIT 82.

In certain of the cases listed above, respondent also determined additions to tax under sections 6653(a)(1) and (2),

and 6661, and additional interest under section 6621(c).[2]  By agreement of the parties, resolution of petitioners' liabilities for the additions to tax and additional interest has been reserved for other proceedings.

In five other cases, respondent determined administrative adjustments to partnership returns, arising from disallowance of claimed partnership losses, as follows:

| Docket No. | Partnership | Taxable Year | Adjustment |
|---|---|---|---|
| 22407-91 | MIT 83 | 1983 | $3,066,626 |
| 22496-91 | MIT 84 | 1984 | 3,035,000 |
| 25519-91 | MIT 85 | 1985 | 2,700,000 |
| 9550-92 | MIT 86 | 1986 | 3,850,000 |
| 10897-93 | W & A | 1987 | 3,586,269 |

In the nine remaining cases, petitioners have requested the following administrative adjustments reflecting the reduction of reported income to zero if we find that the transactions giving rise to that income are shams:

| Docket No. | Partnership | Taxable Year | Adjustment |
|---|---|---|---|
| 14819-91 | MIT 82 | 1986 | $428,142 |
| 14820-91 | MIT 83 | 1986 | 519,960 |
| 3453-92 | MIT 85 | 1986 | 412,722 |
|  |  | 1987 | 1,865,187 |
|  |  | 1988 | 1,419,986 |
| 3456-92 | MIT 82 | 1987 | 840,069 |
|  |  | 1988 | 275,156 |
|  |  | 1989 | 1,274,633 |
| 3457-92 | MIT 80 | 1986 | 443,415 |

---

[2]All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

|         |        | 1987 | 840,838   |
|---------|--------|------|-----------|
|         |        | 1988 | 969,316   |
|         |        | 1989 | 1,335,995 |
| 3461-92 | MIT 84 | 1986 | 546,300   |
|         |        | 1987 | 1,315,352 |
|         |        | 1988 | 23,889    |
|         |        | 1989 | 1,423,786 |
| 3462-92 | MIT 86 | 1987 | 4,855,505 |
| 3551-92 | MIT 83 | 1987 | 797,976   |
|         |        | 1988 | 360,236   |
|         |        | 1989 | 1,218,735 |
| 3221-93 | W & A  | 1988 | 3,586,156 |

The cases in the foregoing dockets have been selected by the parties as test cases that will resolve common issues in more than 120 cases in a group identified by respondent as "Fred Bryen Promotions". Most petitioners in the nontest cases have executed "piggyback agreements" in which they agree with respondent to be bound by the outcomes in the test cases.

## Issues

The global issue in these consolidated cases is the tax effect of the purported employee leasing transactions of seven partnerships. By agreement of the parties, the questions presented for decision are whether the transactions of the seven partnerships had (1) economic substance and (2) a profit objective. Because we answer those questions in the negative, we hold that neither the partners nor the partnerships are entitled to loss deductions for payroll costs, that the Pettisani petitioners are not entitled to deductions for interest on certain long-term notes, that petitioner Intercoastal Management

Co. & Subsidiaries, the operator of the business for which worker services were provided, is not entitled to deduct from its income, ostensible accrued interest, management fees, or override payments to the partnerships, that none of the transactions at issue are recognized for the purpose of claiming deductions or reporting income, and that respondent is not estopped from asserting any of the deficiencies or proposed adjustments at issue.

In view of these holdings, we need not answer any of a series of more particularized substantive tax questions that the parties posed: Whether the partnerships at issue are actually partnerships within the meaning of the Internal Revenue Code; whether the partnerships are employers under the Internal Revenue Code; whether the losses claimed by petitioner partners exceed their bases in the partnerships; whether the partners were at risk with respect to certain notes they issued; and whether the cash method of accounting selected by the partnerships clearly reflected their income.

FINDINGS OF FACT

The parties have stipulated some of the facts, and the eight sets of stipulations of fact and attached exhibits are incorporated in this opinion.

Background

The individual petitioners were residents of New Jersey when they filed their petitions. The principal place of business of the partnerships known as MIT 80, MIT 82, MIT 83, MIT 84, MIT 85, MIT 86, and W & A Payroll Service was Marlton, New Jersey, when their tax matters partner filed the petitions relating to the administrative adjustments or requests for adjustments at issue. When petitioner Intercoastal Management Co. filed its petitions, its principal place of business was Hammonton, New Jersey.

Fred Bryen (Fred) has been a certified public accountant for approximately 40 years. From 1965 to 1978, he was a professor of accounting at Rutgers University. He is also one of the owners and employees of the accounting firm Bryen & Bryen, P.A. (BBPA). His son Bruce, also a certified public accountant, is also an employee-owner of BBPA. Marion Hunt, also a certified public accountant, is the third owner-employee of BBPA. BBPA provided business and tax advice to clients and prepared tax returns, but did not certify financial statements.

In the mid-1970's, Fred and Bruce began to structure and promote tax shelters. These tax shelters were structured by Fred and primarily promoted by Bruce.

One of BBPA's accounting clients was Machise Interstate Transportation Co., Inc. (Machise), a New Jersey corporation

engaged in hauling gasoline and fuel oil. Machise was on the accrual method of accounting and employed a fiscal year ending June 30. Anthony Bucci (Bucci) and Joseph Ingemi (Ingemi) were clients of BBPA. In 1975, Bucci and Ingemi each purchased 50 percent of Machise's stock. At BBPA's suggestion, they transferred their Machise stock to their newly formed corporation, Intercoastal Management Co. (Intercoastal). Bucci and Ingemi were the only shareholders and employees of Intercoastal. The primary purpose for BBPA's recommending the formation of Intercoastal was to provide a means for Bucci and Ingemi to enjoy a generous pension plan without providing for the rank and file employees. During the years at issue, Intercoastal filed consolidated Federal income tax returns with Machise. For purposes of these findings and opinion, Intercoastal and Machise are essentially the same entity. Both corporations were dominated by Bucci and Ingemi, and, after Ingemi's death, by Bucci alone.

Machise subsequently entered into an employee leasing agreement with MIT Personnel Co. (MIT Personnel), a corporation that was owned by Bruce Bryen. Bruce, at the time a young man, agreed to undertake the ownership of MIT Personnel as a favor to Bucci and Ingemi and in the hopes of attaining a promised $50,000 fee from them. Pursuant to this agreement, MIT Personnel was to provide Machise with the employees and independent contractors

that Machise would need to carry on its business. Following execution of the agreement, the same employees and independent contractors who had worked previously for Machise continued to provide the same services for Machise.

Fred recommended that MIT Personnel be formed to enable Bucci and Ingemi to set up a separate pension plan for the rank and file employees. BBPA also advised Bucci and Ingemi that the use of MIT Personnel would minimize their union problems, help reduce their exposure to personal liability arising from accidents to the Machise tank trucks, and minimize their exposure to payroll tax problems if the truck drivers were classified as employees rather than as independent contractors.

On July 1, 1977, Bruce transferred ownership of MIT Personnel equally to Stella Bucci and Lena Ingemi, the mothers of Bucci and Ingemi.

In 1980, the first of the tax years at issue, Bucci and Ingemi owned the stock of Intercoastal and were its only employees. Intercoastal owned the stock of Machise, the operating company. The employees and independent contractors who had worked for Machise continued to work for Machise, but now were ostensibly employed by MIT Personnel, a company owned by the mothers of Bucci and Ingemi.

The following findings of fact describe the form of the transactions that give rise to the tax deductions at issue.

These findings are necessary for an understanding of the issues presented. The descriptions of the transactions, however, are not meant to indicate that the events described actually happened, or that they had any economic effect. We reserve for the opinion below our discussion and conclusions on those matters.

MIT 80

## Formation of MIT 80

Fred decided to abandon the MIT Personnel/Machise leasing arrangement in order to promote annual tax-shelter partnerships that would utilize Machise. To this end, in 1980, Fred and Bruce organized and promoted a general partnership named MIT 80. MIT 80's business address was Allison Drive, Cherry Hill, New Jersey, the same address as BBPA's. MIT 80 moved its business address to 100A Centre Boulevard, Marlton, New Jersey, when BBPA moved there. MIT 80 used the calendar year as it tax year. In order to carry out its tax-shelter objectives, MIT 80 employed the cash method of accounting until December 31, 1986, when it was required to change to the accrual method in accordance with a change in the accounting provisions of the Internal Revenue Code.

MIT 80 obtained an employer identification number from the Internal Revenue Service and opened a payroll account at the Guarantee Bank. Bucci and Ingemi were signatories on this account.

Investors in MIT 80

There were nine investors who became partners in MIT 80--six individuals, a trust, and two partnerships that BBPA had organized. One of the individual partners was Donald P. Crescenzo (Dr. Crescenzo), a dentist who practices in Hammonton, New Jersey. The Bryens were his accountants. Bruce recommended that he invest in tax shelters. He invested in MIT 80 because of the tax-sheltered nature of the investment. Dr. Crescenzo had a lot of faith in the Bryens and left the matter of his investment entirely up to Bruce. He was later surprised to discover that, in the course of becoming a partner in MIT 80, he had signed a note for $150,000.

The MIT 80 investors were provided with a three-page document prepared by BBPA that set forth projections of income and expenses to the end of the partnership term.

Organization and Management of MIT 80

Beginning in July 1980, the nine MIT 80 investors executed powers of attorney in favor of BBPA. Thereafter, at Fred's suggestion, Bruce signed the partnership agreement of MIT 80 on behalf of its investors, who thereby became partners in MIT 80.

During July 1980, the investors, including petitioner Dr. Crescenzo, also executed promissory notes aggregating $2.4 million to Intercoastal. The notes bore interest at the annual rate of 10 percent on the unpaid principal. The notes specified

that they would be repaid in 120 monthly installments of interest and principal.  On July 17, 1980, Intercoastal drew checks on an account at the Bank of New Jersey totaling $2.4 million.  The checks were payable to the MIT 80 investors in amounts equal to the face amounts of their notes.  The investors endorsed these checks to MIT 80.  These endorsed checks constituted the only capital investments in MIT 80 made by the nine investors.[3]

MIT 80 and BBPA also entered into a management agreement, drafted by Fred, dated "as of" January 1, 1980, whereby BBPA agreed to manage MIT 80.  At Fred's behest, Bruce signed the management agreement on behalf of the MIT 80 partners pursuant to their powers of attorney.

MIT 80 Employee Leasing Arrangement

MIT 80 and Machise entered into an employee leasing agreement dated "as of" January 1, 1980.  The agreement provided that MIT 80 would furnish all the employees and independent contractors needed by Machise to conduct its business for the 1980 calendar year.

The agreement specified the duties of the partnership in some detail.  Thus, under the heading "Supply of Individuals",

---

[3]During 1980, the investors of MIT 80 actually made cash payments totaling $158,580.80 to Intercoastal, as payments of principal and interest on their notes.  These payments went into a separate set of accounts called the MIT 80 ledger.  They were deposited with the Merrill Lynch brokerage firm and with the Empire Savings & Loan Association.

the agreement provided--

(a) Within ten (10) days of the effective date of this Agreement, the Company shall provide the Partnership with an estimate of the job classifications and the number of individuals within each job classification that it will require during each month in 1980. In any month, the Partnership shall be obligated to provide only such number of individuals having only the qualification designated in such notice and estimate by the Company * * *.

(b) Ten (10) days prior to the date that the Partnership is to provide an individual to the Company, the Partnership shall provide the Company biographical information of such individual, containing such information as may be mutually agreed between the Partnership and the Company. The amount of payroll costs to be incurred by the Partnership with respect to any such individual shall also be disclosed. * * *

* * * * * * *

(d) The Partnership shall have the exclusive right to determine which of its employees shall perform the job services designated by the Company according to the terms of this agreement. * * * The Partnership shall have the right to control and direct the performance of the services of the individuals, and shall instruct each individual as to his work hours and the nature of his duties. * * *

Under the heading "Supply of Contractors" the Agreement

provided--

(a) The Company shall provide the Partnership at least three (3) days prior to the date needed, the number of contractors required for any particular day, the type of equipment required, the type of product to be hauled and the destination of such product. The Partnership shall be obligated to provide such number of contractors with the required equipment * * *.

(b) One day prior to the date that the Partnership is to provide a contractor to the Company, the Partnership shall provide the Company such information concerning the contractor and his equipment

as may be mutually agreed between the Partnership and
the Company * * *.

        *       *       *       *       *       *       *

        (d)  The Partnership shall have the exclusive
right to determine the contractor to be used to fulfill
the Partnership's obligations under this Agreement.

Fred provided that the term of the employee leasing

agreement between MIT 80 and Machise would be for 1 year so that,

in each succeeding year, he could bring in more investors who

would be able to deduct their shares of the first-year loss of a

new and different tax shelter partnership.  Bruce signed the

employee leasing agreement on behalf of the partners in MIT 80,

writing the words "by power of attorney" below each signature.

Journal entries indicate that MIT 80 advanced 100 percent of

its $2.4 million capital to Intercoastal on July 29, 1980,

although MIT 80 was not specifically required to do so by the

employee leasing agreement.  The journal entries reflect that

these advances took the form of MIT 80's further endorsement of

$2.4 million in checks that originally had been drawn by

Intercoastal, made payable to the MIT 80 investors, and deemed to

have been used by them as their initial investment in MIT 80.

However, the journal entries are the only documents indicating

the endorsements; MIT 80 did not in fact endorse these checks to

Intercoastal.  None of the checks entered banking channels;

instead, as Fred intended, they circled back to Intercoastal,

their drawer.

Thus, at the conclusion of this series of transactions, Intercoastal held, as an advance, the $2.4 million in checks that it had issued to the partners in exchange for their notes, and the partners owed Intercoastal $2.4 million on their notes.

The above transactions are depicted in Illustration No. 1, <u>infra</u> p. 25.

## Operation of MIT 80

Following execution of the employee leasing agreement the same employees and independent contractors who had performed services for Machise continued to perform the same services for Machise. Neither Machise nor MIT Personnel--the prior employers--gave written notice of termination to the employees and independent contractors. The employees and independent contractors did not submit formal employment applications to MIT 80.

Bucci and Ingemi were the individuals most knowledgeable about the detailed work assignments of Machise's employees. They actually directed and controlled the activities of those employees. However, there was no provision in the employee lease with MIT 80, purportedly the new employer, or any other document, under which Bucci and Ingemi were to provide such direction and control. Nor was there any provision in any agreement for remunerating Intercoastal, Bucci, or Ingemi for undertaking to manage the Machise personnel on behalf of MIT 80. Machise made

weekly cash "advances" to the Guarantee Bank payroll account held by MIT 80, although it was not required to do so by the employee leasing agreement.[4]  These advances were equal to the actual weekly worker service compensation payments to employees and independent contractors.  The advances were reflected on the books of MIT 80 and Machise.  During 1980, Machise paid $2,243,495.73 into the MIT 80 payroll account so that MIT 80 could cover the weekly payroll costs for the employees and independent contractors.  Hereafter, use of the term "payroll costs" includes amounts paid with respect to, or on behalf of, both employees and independent contractors.

Bucci and Ingemi retained control of the MIT 80 ledger, although they were not partners in MIT 80.  Either Bucci or Ingemi signed the MIT 80 checks that paid the employees and independent contractors from the weekly advances made by Machise. There was also a pension plan in effect for the rank and file employees.  Bucci decided what investments were to be made for the pension plan, and the comptroller of Machise prepared the

---

[4]Fred testified that there was an "oral agreement" that Machise would advance to MIT 80 the funds needed to pay Machise's employees and independent contractors for the first 6 months of 1980, until MIT 80 obtained funds from its incoming partner-investors.  Thereafter MIT 80 would repay Machise and deposit with Machise the estimated amount needed by MIT 80 to pay the payroll expenses for the second 6 months.  As a result, each week,  Machise would pay into the MIT 80 account the amount needed to meet the Machise payroll.  At the end of the year, Fred explained, "it was all washed out".

quarterly financial statements for the pension plan.[5]

By or on behalf of MIT 80, payroll taxes were withheld from employees' wages and remitted to the appropriate State and Federal Government agencies under MIT 80's employer identification number.  The employment tax returns that were filed showed MIT 80 as the employer.  In 1983, the State of New Jersey made a claim against MIT 80 arising out of an alleged underpayment of unemployment tax contributions in the amount of $140.47.

The employee leasing agreement required Machise to pay MIT 80 a "compensation fee" of 115 percent of the payroll costs paid by MIT 80 with respect to the erstwhile Machise employees and independent contractors.  The 15-percent excess of such costs was the "override".  The override was supposed to compensate MIT 80 for its services in providing and paying the employees and independent contractors to perform the services Machise required

---

[5]The MIT Personnel Co. pension plan was in place for the Machise employees before and during the years in issue.  The MIT 80 partnership and successor partnerships apparently were named parties to this plan by virtue of a "participation agreement". The evidence includes a "Valuation Report" of the "MIT 80 Money Purchase Pension Plan" prepared by an independent pension administration company.  This report indicates that the plan had accrued assets and vesting schedules attributable to years before MIT 80 came into existence.  Additionally, the report's terminology speaks of the MIT 80 "Board of Directors" and "Officers".  These terms are consistent with the employer being a corporation, not a partnership.

in order to carry on its business.[6]  Machise was not required to pay the compensation fee until April 30, 1981, 4 months after MIT 80's obligation to furnish employees and independent contractors had ceased.  Additionally, the employee leasing agreement allowed Machise to defer payment of this fee for more than 10 years, until December 31, 1991, if it paid a 10-percent per year late charge on all deferred unpaid portions of the compensation fee.

Thus, Machise was not required to, and did not, make any payment of the compensation fee to MIT 80 during 1980.  MIT 80, under its cash method of accounting, accordingly reported a loss of $2,247,552.  The loss consisted of the following:

| | |
|---|---:|
| Salaries and wages | $456,618 |
| Rent--independent contractors | 1,673,742 |
| Payroll taxes | 35,877 |
| Pension plan | 37,109 |
| Insurance | 41,823 |
| Professional fees | 2,383 |
| Total | 2,247,552 |

---

[6]Fred explained that, with respect to the employee leasing partnerships, all but 5 percent of the compensation fee constituted interest paid by Machise.  It purportedly owed such interest because of the partnerships' advances of payroll costs during their first-year operations.  This interest component is to be distinguished from the "late charges".  The late charges represent interest imposed as a result of Machise's election not to pay compensation fees in years after completion of the respective partnerships' obligations to supply workers.

Petitioner Crescenzo's Deduction of MIT 80 Partnership Loss

On his individual income tax return for 1980, Dr. Crescenzo reported a Schedule E partnership loss from MIT 80 of $140,472, representing his 6.25-percent share of the loss purportedly incurred in 1980 by the MIT 80 partnership. Respondent has issued a statutory notice of deficiency to Dr. Crescenzo, disallowing this claimed loss deduction.

Post-1980 Transactions of MIT 80

In 1981, Machise "advanced" $6,509 in cash to MIT 80. MIT 80 then paid a net $2,109.97 in payroll taxes. On its partnership return for 1981, MIT 80, under its cash method of accounting, reported a loss of $2,110, which is the net payroll tax payment, rounded off. In 1981, MIT 80's bank account, which had been used as the payroll account during 1980, was closed.

MIT 80 billed Machise $2,587,110.96 as its compensation fee on April 30, 1981, the scheduled payment date. This amount represented the actual payroll costs of $2,247,551.73 plus the $2,109.97 net payroll tax paid in 1980, plus $337,449.26--which represented the 15-percent "override" of the payroll costs provided for in the employee leasing agreement.[7] Machise did not

_____

[7]There are often minor differences between the amount of cash paid into the payroll account during the years at issue, the cash paid out as payroll costs, and the amount of such costs that form the basis of Machise's compensation fee calculations. The parties have not always explained these relatively minor differences, and they are not relevant to our holdings herein.

pay this amount to MIT 80 in 1981, or in 1982, or in 1983. It
instead deferred payment of the compensation fee, thus becoming
subject to the 10-percent annual "late charge". On its books for
each of those years, Machise accrued and deducted for Federal
income tax purposes the late charges payable to MIT 80.

Throughout 1981 and 1982, investors in MIT 80 continued to
make monthly cash payments of interest and principal on their
notes to Intercoastal. By the end of March 1983, Dr. Crescenzo
had made 32 payments on his note to Intercoastal in the total
amount of $63,432. Of this amount, $26,727 was principal and
$36,705 was interest.[8]

Ingemi died early in 1983 and Bucci became owner of 100
percent of the stock of Intercoastal/Machise.

In the first few months of 1983, Dr. Crescenzo and the other
MIT 80 investors executed new notes, prepared by Fred, in favor
of Machise. These notes served as substitutes for the partners'
original $2.4 million notes to Intercoastal, which were canceled.
Some of the new notes were in reduced amounts, reflecting
investors' intervening payments to Intercoastal. Other notes
reflected increased amounts as a result of some investors'
increased obligations to BBPA, which had occasionally made
monthly payments to Intercoastal on behalf of those investors.

-----

[8]In the aggregate, all the investors in MIT 80 paid cash of
$755,142, of which $310,672 was principal and $444,470 was
interest.

On June 3, 1983, Machise drew a check in the amount of $150,338 to MIT 80. This was the amount by which the "advances" from MIT 80 to Machise had exceeded the total weekly amounts paid in 1980 by Machise, through the MIT 80 payroll account, to the employees and independent contractors. In a memorandum to one of the partners, Bruce described this check as a nontaxable return of an advance. Bruce's memorandum stated that the $150,338 had been distributed to the partners pro rata and used by them to make partial payments on the interest due on their notes payable to Machise. Thus, the amount of Machise's check circled back to Machise.

On June 30, 1984, Fred prepared, and Machise issued to MIT 80, a demand note bearing no interest in the face amount of $285,952.34. This note was a partial payment of the 10-percent late charge on the compensation fee due under the employee leasing agreement. Fred doubted that Machise had enough money to pay the note. It was Fred's intention, however, that the note would be endorsed back to Machise in a circular movement and never presented for payment in cash.

On the back of this note was typed:

> Pay to the order of:  Machise
> Interstate Transportation Co.
> [Machise]
> MIT 80

The note also contains the following legend:

> By this endorsement, MIT 80

> distributed $285,952.34 to its
> partners who used the proceeds to
> pay the annual installments on
> their notes payable to MIT
> [Machise] (See schedules)

As a result of the endorsement on the $285,952.34 note, the investors did not make any cash payments on their notes to Machise in 1984.

Machise issued similar notes, similarly endorsed, in June 1985 and 1986, although in those years the notes were each in the amount of $443,415. Each year, the note was issued to MIT 80, distributed to the partners, and then credited against their liabilities to Intercoastal.

In 1986, an entity named Machise Personnel Co. (MPC) purchased all of the financial assets of Machise (subject to any related liabilities) that had been generated by the yearly employee leasing agreements to which Machise was a party. MPC was a partnership consisting of Bucci, who had a 99.999-percent interest, and Intercoastal, with a .001-percent interest. MPC was used to remove from the books of Machise the receivables and several million dollars of liabilities to MIT 80 and its successor partnerships. This was done in order to satisfy lenders and suppliers of Machise. The MIT 80 investors' notes to Machise were accordingly assigned to MPC.

On June 30, 1987, MPC, like Machise in prior years, issued to MIT 80 a demand note, bearing no interest, in the face amount

of $443,415.  This note was a partial payment of the compensation fee and 10-percent late charges due under the employee leasing agreement.  Like earlier similar notes from Machise, this note bore endorsements reflecting that it had been deemed distributed to the MIT 80 partners and then credited to their obligations on their notes to Intercoastal.

The following illustration depicts the purported transactions and flows of funds to which MIT 80 was a party.

### Purported Transactions--MIT 80

A.  Investment Phase

1.  Partners execute 10-percent notes aggregating $2.4 million to Intercoastal.

2.  Intercoastal draws checks aggregating $2.4 million to investors.

3.  Investors endorse the checks to MIT 80 as capital investment in MIT 80.

4.  Bookkeeping entries indicate the $2.4 million in Intercoastal checks endorsed to Intercoastal, although checks are neither endorsed nor otherwise enter banking channels.

B.  Payroll Phase

5.  During 1980, Machise makes weekly transfers totaling $2,243,495.73 to MIT 80 payroll account.

6.  Employees and independent contractors are paid from the amounts transferred to the MIT 80 payroll account with checks signed by officers of Machise.

C.  Repayment Phase

7.  In 1984, repayment begins.  Repayments take the form of Machise demand notes of $443,415 in compensation fees and late charges issued to MIT 80.  (Although the 1984

note was for $285,942, Machise had earlier "advanced" $6,509 and issued a check for $150,338, for a total of $442,789.)  After 1986, the notes were issued by MPC.

8.    The demand notes (and the check for $150,338) are deemed distributed to the MIT 80 partners.

9.    Endorsements reflect that the demand notes (and the check for $150,338) are used to pay partners' installments on their 10-percent notes to Machise, which had replaced the notes to Intercoastal.

10.   MIT 80 employee leasing program terminated in 1988 with MPC's assignment of partners' notes to MIT 80 for credit against MPC's obligations to the partnership. MCP remained indebted to the partnership for $1,295,108, most of which was later claimed as bad debt loss by MIT 80 partners, on transfer of MIT Personnel Co. stock in 1992.  See infra pp. 27-30.

Termination Agreement of MIT 80

Fred prepared a Termination Agreement dated January 1, 1988, between MIT 80 and MPC with respect to the employee leasing agreement.  Fred signed the Termination Agreement as vice president of BBPA on behalf of both MIT 80 and MPC.

As stated in that agreement, MPC owed $2,401,416.25 to MIT 80, but it reduced that amount by $1,407,627 by assigning to MIT 80 the partners' notes to Machise (these notes were the substitutes for the notes originally issued by the partners to Intercoastal).

MIT 80 was then to distribute these notes to its partners. No formal documents to effectuate the assignment of notes from MPC to MIT 80 were prepared, nor were any such documents prepared to carry out either the distribution of the notes to the partners or the assignment of those notes by the partners to Machise.

Additionally, under the Termination Agreement, MIT 80 purportedly forgave MPC's unpaid late charges on the compensation fee in exchange for MPC's promise to pay $301,318.95 as a "Contract Renegotiation Fee".

The purportedly scheduled date of payment of the amounts due under the agreement (including the "Contract Renegotiation fee") was January 1, 1992. This was 1 day past the date upon which the partnership, according to the partnership agreement, was to terminate. Fred testified that there was an oral amendment of the partnership agreement extending the life of the partnership. However, the provisions of the partnership agreement relating to amendments require that amendments be consented to in writing by all of the partners within 20 days of the notice thereunder.

The Termination Agreement provided that, effective as of January 1, 1988, MIT 80 would issue an invoice to MPC in the amount of $301,318.95 for the Contract Renegotiation fee. No such invoice was issued.

In the agreement, MPC agreed to pay to MIT 80 a balance due of $1,295,108. This amount included the $301,318.95 that MPC had agreed to pay in exchange for forgiveness of the late charges. The MIT 80 partners' notes were accordingly marked "Paid 1-1-88". The debt of $1,295,108 from MPC to MIT 80 remained outstanding for several years, and was ultimately dealt with as shown infra pp. 30-31.

The operation of the MIT 80 Termination Agreement may be depicted as follows:

| | |
|---|---:|
| Owed by MPC to MIT 80 as unpaid compensation fee | $2,401,416 |
| Owed by MPC to MIT 80 as Contract Renegotiation fee | 301,319 |
| Credited by MPC to MIT 80 as assignment of partners' notes to Machise | (1,407,627) |
| Amount still owed MIT 80 by MPC | 1,295,108 |

## Partnership Income of MIT 80

In 1985 and 1986, MIT 80 reported net partnership taxable income of $443,415, reflecting the receipt of the notes (bearing no interest) from Machise, and treating them as the equivalent of cash.

For the year 1987, MIT 80 changed its method of accounting from the cash method to the accrual method.[9] On its partnership return for 1987, MIT 80 reported partnership taxable income of $840,838, consisting of $667,997 (one-fourth of the $2,671,990 deferred income that it was allocating over 4 years due to the change in accounting method), plus $241,590.43, shown as late fee

---

[9]In a statement attached to the Form 3115 in which MIT 80 changed its method of accounting, BBPA explained that MIT 80 was a "tax shelter as defined in Section 461(i)(3)". As such, it was precluded from using the cash method after Dec. 31, 1986. BBPA further indicated that MIT 80's "accrued but not received" income was $2,671,990. Under the pertinent regulations, sec. 1.448-1T(g)(2)(i), Temporary Income Tax Regs., 52 Fed. Reg. 22772 (June 16, 1987), it was required to take this amount into account ratably over the next 4 years. If it ceased business before the end of those 4 years, it was to take the entire balance into account for its last taxable year. Sec. 1.448-1T(g)(3)(iii), Temporary Income Tax Regs., 52 Fed. Reg. 22773 (June 16, 1987).

income, less a $68,750 management fee expense to BBPA. On its partnership return for 1988, MIT 80 reported partnership taxable income of $969,315, consisting of $667,997 (one-fourth of the $2,671,990 deferred income that it was allocating over 4 years due to the change in accounting method), plus $301,319, the "Contract Renegotiation fee", less a $1 fee expense to BBPA.

On its partnership return for 1989, MIT 80 reported partnership taxable income of $1,335,995, which was the remaining one-half of the $2,671,990 deferred income that it was allocating due to the change in accounting method, and no expenses.

MIT 80 has pending claims in one of these consolidated cases to adjust its reported income to zero for the years 1985, 1986, 1987, 1988, and 1989, if we should determine that MIT 80 is a sham that is not entitled to deduct losses for its prior years. Respondent agrees that, if we should so find, the requested adjustments would be appropriate.

During 1990, Dr. Crescenzo transferred his 6.25-percent interest in MIT 80 in approximately equal shares to Bruce, Bucci, and Richard Adamucci. Dr. Crescenzo received $63,300 for this interest, or $132 less than he had invested in MIT 80.

MIT 80 had no activity in 1990 or in 1991, and its partnership returns reflect no income or loss for those years.

The business of Machise was thereafter transferred to MIT Transportation Co., Inc., which was wholly owned by Bucci. On

January 1, 1992, Bucci, MPC, MIT 80, and BBPA executed an agreement, prepared by Fred, whereby Bucci agreed to transfer 500 shares of his stock in MIT Transportation Co., Inc., to MPC. The agreement recited that MIT 80 agreed to accept the 500 shares from MPC in full payment of the $1,295,108 due to it from MPC. None of the parties to this transaction were represented by counsel.

No one made a formal appraisal of the MIT Transportation Co. stock. Bruce nevertheless issued a memorandum to the MIT 80 partners explaining that since the value of the MIT Transportation stock was $250,000, MIT 80 could claim a bad debt deduction for 1992 in the amount of $1,045,108 ($1,295,108 - $250,000).

The stock sale may be depicted as follows:

| | |
|---|---|
| Amount owed MIT 80 by MPC from 1988 to (1992) | $1,295,108 |
| Claimed value of MIT Transportation Co., Inc. stock given to MPC, then to MIT 80 | (250,000) |
| Amount BBPA advised MIT 80 partners to claim as a loss in 1992 | 1,045,108 |

The partners were allocated pro rata amounts of this $1,045,108 loss in 1992.

None of the investors in MIT 80 received more from the operation of the partnership than he had invested.

## MIT 82

### Formation of MIT 82

On January 1, 1982, Fred and Bruce organized and promoted MIT 82, in the form of a general partnership.[10]  As with MIT 80, MIT 82's address was the same as BBPA's.  MIT 82 used the calendar year as its tax year and the cash method of accounting from its inception through December 31, 1986.  BBPA made the general journal entries for MIT 82 for the years 1982 through 1986 and adjusting journal entries for 1982 through 1987.

Like MIT 80 before it, MIT 82 entered into an employee leasing agreement with Machise under which MIT 82 was to provide all the individual employees and independent contractors required by Machise for the period January 1 through December 31, 1982. The arrangement was essentially the same as that of MIT 80, but this time BBPA paid more attention to details.  The employee leasing agreement again stated that the partnerships would provide Machise with employees, independent contractors, and equipment, plus biographical information about those workers.  It also provided that the partnership would have the right to control and direct the employees and that the partnership would

---

[10]Fred had also organized MIT 81 to lease employees and independent contractors to Machise for the period Jan. 1 through Dec. 31, 1981.  There are no cases before this Court involving adjustments to the partnership returns of MIT 81 or to the tax returns of the individual participants in MIT 81 with respect to their interests in MIT 81.

"instruct each individual as to his work hours and nature of his duties."  As to the contractors, the partnership again had "the exclusive right to determine the contractor to be used" in Machise's business.

MIT 82 and BBPA entered into a management agreement, prepared by Fred and dated January 1, 1982, whereby BBPA would manage MIT 82.  The management agreement provided that BBPA would receive "such compensation as shall be mutually agreed upon by the parties", but no less than $45,000 per year.

MIT 82 had several accounts at various banks.  One of these accounts was a checking account at the Guarantee Bank, which was the payroll account.  Pursuant to authorization of BBPA, Bucci and Ingemi were authorized signatories on the MIT 82 account at the Guarantee Bank.

Investors in MIT 82

Fred prepared the MIT 82 partnership agreement.  Petitioners Barry and Nancy Bealor, James Cameron, and Frank Pettisani were clients of BBPA who became investors and partners in MIT 82.  There were 23 other individuals and three partnerships, also clients of BBPA, who were also investor partners in MIT 82.  Some of the prospective investors in MIT 82 received a four-page document prepared by BBPA (or a later version of three pages).  These documents made projections of income, expenses, and cash-flow for MIT 82 to the end of the partnership term.

Organization and Management of MIT 82

As the program was structured, the investors were required to execute notes to Machise representing ten-elevenths of their investment in MIT 82.  Pursuant thereto, the Bealors executed a note to Machise on October 1, 1982, for $100,000; Cameron executed a note to Machise on September 9, 1982, for $100,000; and Pettisani executed a note to Machise on July 1, 1982, in the amount of $200,000.  These notes bore interest at a rate of 10 percent per annum and were payable in level installments.  The other partners executed similar notes; taken together, the partners' notes to Machise totaled $3,075,000.  The first installments on these notes were not due until July 1, 1983.

In 1982, in exchange for their notes to Machise, Machise lent $3,075,000 to the investors in MIT 82.  This amount was equal to ten-elevenths of MIT 82's capital.  Machise's loans lacked physical form; they did not exist as checks, notes, or cash.  They were recorded only by journal entries on Machise's books.  These amounts were then deemed to be contributed to the MIT 82 partnership with no supporting documentation other than journal entries on the books of MIT 82 maintained by BBPA.

In addition to executing the notes, the investors were required to pay, in the aggregate, $307,500 in cash to MIT 82 as the other one-eleventh of their capital investment in MIT 82. Some of the investors in MIT 82 paid their share of the required

cash in full in 1982. Others paid part, or none at all. Some of the amounts not paid were eliminated by offsetting journal entries, reflecting an apparent decision by BBPA not to attempt to collect the unpaid amounts.

In order to obtain access to this cash, Bruce executed a "line-of-credit" note, dated January 1, 1982, from BBPA to MIT 82, whereby BBPA could borrow up to $300,000 from MIT 82 at a 15-percent interest rate. If BBPA borrowed this amount, it would owe $45,000 annually to MIT 82 as interest. Fred intended that this interest would be offset by the $45,000 management fee that MIT 82 owed to BBPA. During the time the line-of-credit note was outstanding, the annual interest (owed to MIT 82) was $28,500, or 15 percent of the $190,000 borrowed by BBPA under the line-of-credit note. BBPA accordingly lowered its management fee to $28,500, in order to offset exactly the interest owed by MIT 82.

On the same date, Machise executed a separate line-of-credit note to BBPA, whereby it could borrow up to $180,000 of the partners' cash investment from BBPA, at 7-1/2-percent interest. During 1982, some $190,000[11] of the investors' cash passed from MIT 80 to BBPA. BBPA retained 40 percent of this amount, some

---

[11]BBPA's note indicates that it borrowed $190,000 at the end of 1982, although the books maintained for MIT 82 reflect that only a total of $174,000 in cash was paid in during 1982. It was deposited into an account controlled by BBPA. The record also indicates, however, that some investors transferred other investment instruments or accounts receivable in lieu of cash for purposes of meeting their cash requirements. The $190,000 figure thus may reflect that some of these noncash assets were advanced to BBPA.

$76,000, and the remaining 60 percent, $114,000, went to Machise. Machise's receipt of 60 percent of the cash put up by the investors was one of its incentives to participate in the deal.

MIT 82 Employee Leasing Agreement

The employee leasing agreement of MIT 82 and Machise, prepared by Fred, was dated as of January 1, 1982. Like the MIT 80 employee leasing agreement, the MIT 82 agreement provided that MIT 82 would furnish all the employees and independent contractors needed by Machise to conduct its business for the 1982 calendar year. It stated that Machise would provide the partnership with estimates of the number of employees or contractors Machise would need to carry on its business. It further stated that the partnership would provide Machise with the employees, independent contractors, and equipment, plus antecedent biographical information about the workers. It again provided that the partnership would have the right to control and direct the employees and that the partnership would "instruct each individual as to his work hours and nature of his duties." As to the contractors, the partnership again retained "the exclusive right to determine the contractor to be used" in Machise's business.

Unlike the MIT 80 arrangement, the MIT 82 employee leasing agreement specifically required MIT 82 to advance the lesser of its invested capital or $3 million to Machise. As of December 31, 1982, the books of MIT 82 showed that it had

advanced $3,075,000 to Machise.  Fred explained that the parties had orally agreed to increase the amount that the partners could invest.  Other than journal entries, however, there are no documents showing that this amount was ever paid.

Illustration No. 2, <u>infra</u> p. 42, depicts the purported transactions and flows of funds of MIT 82.

Operation of MIT 82

The employees and independent contractors were the same employees and independent contractors who provided their services to Machise before the employee leasing agreement was made.  The employees and independent contractors were not consulted about the employee leasing agreement.  They did not submit formal employment applications to MIT 82, nor did they explicitly consent to the execution of the employee leasing agreement.  MIT 82 provided no work space or tools or equipment to the workers after the execution of the leasing agreement.

In contrast to the situation of MIT 80, MIT 82, Intercoastal, and Machise entered into a management contract dated January 1, 1982.  This agreement, prepared by Fred, provided that Intercoastal would manage Machise on behalf of MIT 82 for the period January 1 to December 31, 1982.  The compensation to be paid by MIT 82 was to be the amount of Intercoastal's costs, plus a "supplemental management fee" to be determined by Machise's board of directors.  Following the execution of this agreement, Bucci and Ingemi still directed and

controlled the employees.

In contrast to the situation of MIT 80, the employee leasing agreement specifically required Machise to make advances of cash to MIT 82. These cash advances were to be equal to the actual costs of meeting the Machise payroll. During 1982, Machise made these advances by transferring $2,550,150 into the MIT 82 payroll account so that MIT 82 could cover the payroll costs.

These weekly cash advances took place by means of a transfer from a Machise bank account to the MIT 82 Guarantee Bank payroll account. The employees and independent contractors were paid from this account with MIT 82 checks signed by either Bucci or Ingemi.[12]

Payroll taxes were withheld from employees' wages and remitted to the appropriate State and Federal agencies under MIT 82's employer identification number. The name MIT 82 appeared on New Jersey unemployment compensation documents. MIT 82 also appeared as the employer on the employment tax returns that were

---

[12]Although not spelled out in the MIT 82 employee leasing agreement, Fred testified that the payroll procedure was to be like that in MIT 80, whereby Machise would advance enough money to cover its payroll in the first 6 months. After July 1, 1982, when the partners' money came in, MIT 82 would pay over enough for the entire year's payroll. The resulting difference between the $3,075,000 allegedly advanced by MIT 82 to Machise and the $2,550,150 advanced to MIT 82 by Machise resulted in an asset called "Due from MIT 82-Advanced" in the amount of $524,850. (This amount was later increased, probably reflecting the difference between the amounts transferred to the payroll account and the amount paid from this account.) In subsequent years, Machise applied alleged payments of compensation fees toward these advances.

filed.

MIT 82 paid $1,947,852 to employees and independent contractors and taxing authorities. Some $51,908 was paid or accrued for workmen's compensation, health, and group life insurance premiums. MIT 82 paid an additional $461,092 for professional and management fees and $106 for bank charges. Of this amount, some $460,000 constituted fees paid to Intercoastal for the management of Machise. MIT 82 also accrued a pension contribution expense of $43,907.[13] The total was $2,504,865.

As with MIT 80, the employee leasing agreement required Machise to pay to MIT 82 a "compensation fee" of 115 percent of the payroll costs paid by MIT 82, plus 115 percent of the amount MIT 82 paid to Intercoastal for management services. Under the employee leasing agreement, no part of this compensation fee was due and payable until June 30, 1983, 6 months after MIT 82's obligation to furnish employees and independent contractors had ceased. Machise could also defer payment of the compensation fee for more than 10 years, until July 1, 1993, if it paid a 10-percent per year late charge from June 30, 1983, on all deferred

---

[13]The exhibits include a "Valuation Report" of the "M.I.T. 82 Money Purchase Pension Plan" prepared by an independent pension-administration company. This report contains, as an attachment, a Form 5500-R "Registration Statement of Employee Benefit Plan". That form indicates that the plan sponsor was MIT Personnel Co. and that the plan was instituted on Dec. 31, 1973. The form, which bears the date 1982, also indicates that the plan was not "terminated during this plan year or any prior plan year." As with the other partnerships, MIT 82 was a party apparently only by virtue of a "participation agreement" with the MIT Personnel Co. plan. See supra note 5.

unpaid portions of the compensation fee.

Thus, Machise was not required to, and did not, make any payment of the "compensation fee" to MIT 82 during 1982. MIT 82, under its cash method of accounting, accordingly reported a net loss of $2,488,164. This loss was the excess of the $2,504,865 payroll costs and other expenses over reported partnership interest income of $16,701.

Individual Petitioners' Deductions of Partnership Loss

On their individual income tax return for 1982, the Bealors reported a loss of $80,915, representing their 3.252-percent share of MIT 82's partnership loss. James Cameron reported the same amount as his 3.252-percent share of those losses in his 1982 Federal income tax return. Frank Pettisani, in his 1983 return, reported a Schedule E loss of $161,830, representing his 6.504-percent share of MIT 82 losses. The other investors in MIT 82 also reported Schedule E partnership losses from MIT 82, in proportion to their interests.

Respondent issued statutory notices of deficiency to the named investors and the other investors, disallowing the claimed MIT 82 losses for 1982.

Intercoastal's Deduction of Compensation Fee

For the 6-month period January 1, 1982, to the end of its fiscal year on June 30, 1982, Machise/Intercoastal accrued and deducted, as "rents" for Federal income tax purposes, $1,389,950 with respect to payroll costs. For the next 6-month period of

the following fiscal year--July 1 to December 31, 1982--
Machise/Intercoastal accrued, and deducted as rents, another
$1,490,645. For the combined 12-month period, these amounts
totaled $2,880,595, or 115 percent of the payroll costs allegedly
paid by MIT 82.

Respondent issued a statutory notice of deficiency to
Intercoastal disallowing Intercoastal's claimed deduction, for
the fiscal years ended June 30, 1982 and 1983, of those parts of
its "rents" expense that represent 15 percent of the compensation
fee under the employee leasing agreement, for the management fee
expense, and for the interest expense.

Post-1982 Transactions of MIT 82

On July 1, 1983, some 6 months after MIT 82's obligation to
provide Machise with employees and independent contractors had
ended, MIT 82 billed Machise for 115 percent of the payroll
costs, as the compensation fee pursuant to the employee leasing
agreement. Under the employee leasing agreement, Machise was not
required to pay this amount until July 1, 1993, if it paid the
10-percent annual late charges.

MIT 82 closed its bank accounts in 1983. The journal
entries for 1983 indicate that Machise issued to MIT 82 a check
for $473,458, which was circled from MIT 82 through the partners
and back to Machise, without being deposited. However, no copy
of any such check appears in the record. All of MIT 82's
subsequent years' financial operations were effected through

noncash transactions, made by issuing, endorsing, or canceling notes, and recorded only by journal entries. These were Machise's payments, in 1984, 1985, and 1986, of $473,458 as deferred payments of the compensation fee, plus interest (the 10-percent late charge). The payments took the form of demand notes executed by Machise. These payments were recorded as passing through MIT 82, as compensation fee income or as a return of advances under the employee leasing agreement. The payments exited as capital distributions to the partners. The payments, which took the form only of endorsements to the Machise demand notes, then passed from the partners as payments on their notes to Machise, which reported them as income.

For the year 1987, MPC, which had succeeded to the interests of Machise, assumed the responsibility of making its payments. The books of MIT 82 reflect that, in 1987, MPC transferred $473,458 to MIT 82.

The Pettisanis' Deductions of Interest Payments

Each year, Fred treated as deductible interest some part of the $473,458 amount that was applied against the partners' note obligations to Machise. The partners in MIT 82, following instructions from BBPA, accordingly filed individual income tax returns (Forms 1040) on which they claimed their pro rata shares of the resulting deductions.

Frank and Lucille Pettisani claimed Schedule E interest deductions of $20,000, $18,921, $17,733, $16,427, and $21,697 on

Frank Pettisani's note obligations incurred to finance his participation in MIT 82 for the years 1983 through 1987, respectively.  Respondent has disallowed these deductions.

MIT 82 journal entries indicate that, on December 31, 1987, MIT 82 distributed its $190,000 line-of-credit note from BBPA to the partners, who in turn endorsed it to MPC for credit against their notes, originally made to Machise.

The following illustration depicts the purported transactions and flows of funds to which MIT 82 was a party.

### Purported Transactions--MIT 82

A.  Investment Phase

1.  Partners issue $3,075,000 in 10-percent notes to Machise, representing ten-elevenths of MIT 82's capital.

2.  Machise lends $3,075,000 to investors in MIT 82, represented only by journal entries.

3.  The MIT 82 partners advance $3,075,000 to MIT 82, represented by their subscription agreements.

4.  Pursuant to the employee leasing agreement, MIT 82 advances $3,075,000 to Machise, represented only by journal entries.

5.  In addition to long-term notes, during 1982 partners invest cash of $174,000 plus other assets.

6.  During 1982, BBPA takes $190,000 from the partners' cash investment account pursuant to a line-of-credit note with MIT 82.

7.  During 1982, BBPA advances $114,000 of this cash to Machise.

B.  Payroll Phase

8.  During 1982, Machise makes weekly transfers totaling

$2,550,150 to MIT 82 payroll account.

9.  Employees and independent contractors are paid $2,504,865 from the amounts transferred to the MIT 82 payroll account on a weekly basis with checks signed by officers of Machise.

C.  Repayment Phase.

10.  In 1983, annual repayment begins with an alleged Machise check and then its demand notes to MIT 82 of $473,458 in compensation fees and late charges.  After 1986, the repayment is made by MPC.

11.  The demand notes are deemed to pass through the MIT 82 partners.  Also on December 31, 1987, MIT 82 distributes the $190,000 line-of-credit note from BBPA to its partners.

12.  The demand notes, and the BBPA line-of-credit note, are used to pay partners' installments on their 10-percent notes to Machise.

Termination Agreement of MIT 82

On January 1, 1988, Fred drafted a Termination Agreement to end the obligations of MIT 82 and MPC under the employee leasing agreement.  As recited in the agreement, MPC owed $2,307,059 to MIT 82, and it offered to pay $1,974,901 by means of a 10-percent note to MIT 82.  MIT 82 accepted the offer as full payment and agreed to terminate the employee leasing agreement.  Under the termination agreement, MIT 82 gave up rights to collect the difference, some $332,158, from MPC.

The Termination Agreement required MIT 82 to distribute MPC's note for $1,974,901, executed pursuant to the Termination Agreement, to its partners.  Under the Termination Agreement, the partners were to direct MIT 82 to assign that note in payment of amounts they owed MPC on their notes originally payable to

Machise but subsequently assigned to MPC.  There is no evidence

that MPC issued any note for $1,974,901.  A summary of the effect

of the MIT 82 Termination Agreement shows the following:

Owed by MPC to MIT 82 as unpaid                    $2,307,059
  compensation fee
Accepted by MIT 80 in full satisfaction of         (1,974,901)
  amounts owed by MPC; this amount to be
  used to offset Partners' notes to Machise
Amount forgone by MIT 82 in unpaid                    332,158
  compensation fees

Fred designed the Termination Agreement so that everything

would "zero out".  He signed it under the heading "Bryen & Bryen,

P.A." on behalf of both MIT 82 and MPC.  Fred explained "the

whole reason they [the MIT 82 partners] did it is to get rid of

the risk.  They owed $2 million and if Machise [sic, read "MPC"]

did not pay the compensation fee, these partners would be after

me with guns."

Partnership Income of MIT 82

For the year 1986, MIT 82 reported partnership taxable

income of $428,142.  This amount included the $473,458 payment,

in the form of a Machise demand note, of compensation fee income,

plus interest from BBPA of $30,669, less $75,985 in accounting

fees and management expenses to BBPA.

For the year 1987, MIT 82, like MIT 80, changed its method

of accounting from the cash method to the accrual method,

reflecting the new requirements of the Tax Reform Act of 1986.

MIT 82 accordingly reported partnership taxable income of

$840,069 for 1987.  This consisted of $637,316, one-fourth of the

$2,549,264 deferred income that it was allocating over 4 years, plus $231,253 in accrued interest payable from MPC, less $28,500--a management fee expense to BBPA.

On its partnership return for 1988, MIT 82 reported partnership taxable income of $275,156. This amount consisted of $637,316, again one-fourth of the $2,549,264 deferred income that MIT 82 was allocating over 4 years, less $332,159--the amount, rounded off, that MIT 82 had agreed to forgo in exchange for early payment to terminate the employee leasing agreement--less professional fees of $30,001.

On its partnership return for 1989, MIT 82 reported gross income of $1,274,633. This was the remaining one-half of the $2,549,264 deferred income that MIT 82 allocated over 4 years due to the change in accounting method. MIT 82 reported no expenses.

MIT 82 thus reported substantial amounts of income for the years 1986, 1987, 1988, and 1989. In two of these consolidated cases (docket Nos. 14819-91 and 3456-92) MIT 82 has claims pending that the amounts of income it reported for those years should be reduced to zero if we determine that MIT 82 is a sham that is not entitled to deduct losses for its prior years. Respondent agrees that, if we should so determine, the requested adjustments would be appropriate.

None of the investors in MIT 82 ever received any cash return from his investment.

## MIT 83

The organization and operation of MIT 83 resembled those of MIT 82. However, the program was further complicated by the addition of other entities.

On January 1, 1983, Fred and Bruce organized and promoted MIT 83 as a general partnership. Like MIT 80 and MIT 82, MIT 83 used the calendar year as its tax year and the cash method of accounting from its inception until December 31, 1986. As with MIT 80 and MIT 82, its address was the same as BBPA's. BBPA made the journal entries of MIT 83 for 1983 and 1984 and its adjusting journal entries for 1984, 1985, 1987, and 1988.

As with MIT 80 and MIT 82, MIT 83 had a bank account at the Guarantee Bank, which was the payroll account. Pursuant to authorization by BBPA, Bucci was an authorized signatory on the MIT 83 account.

### MIT 83 Investors

Fred prepared the MIT 83 partnership agreement. There were 25 partners, 23 individuals and 2 partnerships. Some of the prospective investors in MIT 83 received a three-page document prepared by BBPA. It set forth projections of financial income, expense, and cash-flow to the end of the partnership term.

### Organization and Management of MIT 83

A corporation named Qulart, Inc. (Qulart), had been formed on December 4, 1979, with Bruce as its sole shareholder. Qulart used a fiscal year ending June 30 as its tax year and employed

the accrual method of accounting. Qulart was inactive through its fiscal year ending June 30, 1983. On July 1, 1983, Bruce transferred all of the stock of Qulart to Marion Hunt, the third owner-employee of BBPA. Qulart had the same business address as BBPA. Qulart did not, however, have a bank account, nor did it prepare financial statements for credit purposes.

Fred intended Qulart to be a conduit between Machise and the MIT 83 partners. As with MIT 82 and MIT 80, Machise was the funding source of the noncash portion of the partners' investments, but the loans from Machise to the partners and their notes to Machise in return were both to pass through Qulart. Qulart's borrowings and lendings, like its reported income and expenses for tax purposes, were a wash.

During the years in issue, the stated purpose of Qulart was to prevent Machise from assigning to third parties the investors' notes used to finance the employee leasing operations. Other than the change made by inserting Qulart, the funding of MIT 83 was the same as that of MIT 82. Thus, the plan was that MIT 83 would advance ten-elevenths of its capital to Machise.

Accordingly, 23 of the MIT 83 partners executed notes to Qulart, dated July 1, 1983, in amounts aggregating $2,623,666. The notes required annual payments of interest only, at a rate of 12 percent per annum, and did not provide for repayment of the principal until July 1, 1994, 11 years after their dates of execution. Fred and Bruce were partners in MIT 83 and executed

similar notes totaling, in the aggregate, $265,000. Fred's and Bruce's notes, however, were made out to Machise, and not to Qulart, apparently because of an error. The total of the investor notes was therefore $2,888,666, an amount equal to ten-elevenths of MIT 83's capital.

On July 1, 1983, Qulart issued to Machise a 12-percent promissory note in the amount of $2,888,666, whose provisions tracked the provisions of the partners' notes to Qulart.

Machise then lent $2,888,666 to Qulart by means of a demand note, providing for no interest. Qulart then lent $2,888,666 to the 25 investors in MIT 83, including Fred and Bruce. Instead of taking the proceeds from Qulart, however, the MIT 83 partners purportedly directed Qulart to provide directly to MIT 83 the $2,888,666 that the partners had borrowed from Qulart. Qulart therefore endorsed to MIT 83 the $2,888,666 demand note that Qulart had received from Machise.

In addition to their notes, the investors were required to put up, in the aggregate, $288,866 in cash as the other one-eleventh of their capital investment in MIT 83. Seventeen of the 25 investors in MIT 83 paid their share of the required cash in full in 1983, in the amount of $118,868, plus $13,902 in interest.

BBPA issued a note receivable to MIT 83 representing payment in respect of the cash required of the other eight investors in MIT 83, who issued short-term promissory notes to MIT 83. The

notes, aggregating $170,000, were dated January 1, 1983. They were payable January 1, 1984. Some of the investors paid these notes with cash, while others paid by means of offsets. Some portions of these notes remain unpaid.

As with MIT 82, Bruce executed a "line-of-credit" note, dated January 1, 1983, from BBPA to MIT 83, whereby BBPA could borrow up to $300,000 in investor cash from MIT 83 at a 15-percent interest rate. Of the investors' cash paid in, BBPA retained $46,500, a draw on the line-of-credit note. Pursuant to the line-of-credit note, MIT 83 also endorsed, or otherwise transferred to BBPA, the $170,000 in short-term partner notes.

Machise executed a second line-of-credit note to BBPA, also dated January 1, 1983, whereby Machise could borrow up to $180,000 of the investors' cash from BBPA. Some $69,800 in investor cash was originally disbursed to Machise. Machise became obligated to BBPA in this amount.

As a result, MIT 83 had a corresponding "receivable" account from BBPA for $284,300, represented by its line-of-credit note from BBPA.[14] Another $13,669 of investors' cash went to BBPA as

---

[14]This amount consisted of the $46,500 of investor cash BBPA retained, plus the $69,800 given to Machise, plus $168,000 in short-term investor notes owed by BBPA in lieu of the unpaid cash required of the eight investors. The difference between the $170,000 figure for the short-term notes and $168,000 reflects a correction with respect to deposits. The cash paid out exceeds the amounts of cash stipulated as having been paid in during 1983. The difference of $2,559 is not explained; it may have come from interest payments or from additional payments on the

(continued...)

professional fees, and $5,330 went to BBPA as an "exchange account".

MIT 83 Employee Leasing Agreement

As with MIT 80 and MIT 82, MIT 83 and Machise entered into an employee leasing agreement, dated January 1, 1983. Therein MIT 83 agreed to provide all the individual employees and independent contractors required by Machise to conduct its business for the period January 1 through December 31, 1983. Like the prior agreements, the MIT 83 agreement stated that Machise would provide the partnerships with estimates of the number of employees or contractors it would need to carry on its business. It further stated that the partnerships would provide Machise with employees, independent contractors, and equipment, plus biographical information about those workers. It again provided that the partnership would have the right to control and direct the employees and that the partnership would "instruct each individual as to his work hours and nature of his duties." As to the contractors, the partnership again had "the exclusive right to determine the contractor to be used" in Machise's business.

The employee leasing agreement specifically required MIT 83 to advance ten-elevenths of its invested capital--or $2,888,666-- to Machise. MIT 83 accomplished this advance by endorsing to

(...continued)
partners' short-term obligations.

Machise the $2,888,666 non-interest-bearing demand note originally made by Machise in favor of Qulart (which Qulart, at the MIT 83 partners' behest, had endorsed to MIT 83). Because Machise received back its own note, that note was retired.

Operation of MIT 83

Another new entity, a partnership named MIT Associates (MITA), was formed on January 1, 1983, with Bucci and Intercoastal as its two partners. Bucci had a 99-percent interest in MITA, and Intercoastal had the 1-percent interest. MITA employed the calendar year as its tax year and used the cash method of accounting. The address of MITA was the same as that of Machise--500 North Egg Harbor Road, Hammonton, New Jersey. Ingemi's widow had instituted a lawsuit against Bucci and his companies, and MITA was formed to prevent that litigation from affecting the MIT partnerships.

MIT 83, MITA, and Machise entered into a management agreement dated January 1, 1983. This agreement, prepared by Fred, provided that MITA would manage Machise on behalf of MIT 83 for the period January 1 through December 31, 1983, for a "fee to be determined by mutual agreement". After execution of the management agreement, Bucci still controlled and directed the employees and independent contractors.

The employees and independent contractors were the same employees and independent contractors who had provided their services to Machise prior to the MIT 83 employee leasing

agreement.  They did not receive written notice of termination either by Machise or by MIT 82.  They did not submit formal employment applications to MIT 83.

The employee leasing agreement required Machise to make advances of cash to MIT 83.  These cash advances were equal to the actual costs of meeting the Machise payroll.  During 1983, Machise advanced $3,061,723 to MIT 83 to cover the payroll costs.[15]

These weekly cash advances were transferred from a Machise bank account to the MIT 83 Guarantee Bank payroll account.  The employees and independent contractors were paid by checks drawn on this account and signed by Bucci.

Payroll taxes were withheld from employees' wages and remitted to the appropriate State and Federal agencies under MIT 83's employer identification number.  MIT 83 appeared as the employer on the employment tax returns that were filed.

On February 26, 1983, the New Jersey Department of Labor wrote to "William Bryen and Bruce Bryen, t/a MIT 83".  The letter stated that "our records indicated that you were not registered under the New Jersey Unemployment Compensation Law".  Machise, not MIT 83, was listed as the insured on the Standard Workmen's Compensation and Employer's Liability Insurance policy for the

---

[15]Machise ultimately advanced $189,908.85 more to MIT 83 than MIT 83 had advanced, as ten-elevenths of its capital, to Machise.  Therefore, Fred prepared a demand note without interest in order to pay off the unpaid balance of this excess.

period July 1, 1983, through July 1, 1984. Additionally, in 1983, Bucci, as president of "MIT" (which we are calling "Machise") verified the employment of one of its drivers to a mortgage company. MIT 83 was, however, listed as the employer on workmen's compensation claim forms. Machise's controller did not remove Machise from the workmen's compensation policy; he just added the name of the new lessor partnerships to the policy. He did not, however, remove the previous partnership names for several years, "just to be sure".

MIT 83 paid $2,528,416 to employees and independent contractors and taxing authorities. It paid out additional professional and bank fees, pension expenses and workmen's compensation, health, and group life insurance premiums. In addition, on December 22, 1983, MIT 83 issued a check to MITA, in the amount of $363,000, as the total management fee due under the management contract.[16] The total paid by MIT 83 during 1983 was $3,080,528.

Under its cash method of accounting, MIT 83 claimed a net loss of $3,066,626, which was the excess of the $3,080,528

---

[16]The check was drawn on the Guaranty Bank account and signed by Bucci. The amount was recommended by Fred. The balance in the MIT 83 account when this check was written was $86,327.79. Fred intended this check to circle back into the MIT 83 account. On the day this check was issued, MITA endorsed it to Machise as payment of an alleged guaranty fee and the advance by Bucci to Machise to reduce his account. Machise endorsed the check back to MIT 83 as part of the advances required under the employee leasing agreement. On the day the check was drawn, it was deposited into the account upon which it was drawn. The check, in effect, funded itself.

payroll costs over reported partnership income of $13,902. The reported partnership income was interest income that came from BBPA. The interest was based upon BBPA's borrowing of the investors' cash on the line-of-credit note. This income was offset by a claimed deductible payment to BBPA of professional fees of $14,366.

Tax Deductions

On their individual income tax return for 1983, the 25 participants in MIT 83 reported Schedule E partnership losses from MIT 83 in proportion to their interests in the partnership.

Respondent issued a notice of final partnership administrative adjustment to MIT 83, in which respondent disallowed the entire claimed MIT 83 partnership loss of $3,066,626 for the year 1983.

For the period January 1 through June 30, 1983, Machise accrued and deducted, for Federal income tax purposes, "rents" of $1,468,830. For the period July 1 through December 31, 1983, Machise/Intercoastal accrued, and deducted for Federal income tax purposes, "rents" of $2,061,962. For the two periods, these amounts totaled $3,530,792, which is 115 percent of the $3,070,253[17] paid by MIT 83 for payroll and independent contractor costs.

---

[17]There is a relatively minor difference between the pre-override amount that Machise used as a basis for computing its "rents" for the two 6-month periods in question and the amount claimed as a loss by MIT 83. The difference reflects an amount spent by MIT 83 in 1984.

Respondent has issued statutory notices of deficiency to Intercoastal for its fiscal years ended June 30, 1983 and 1984. In those deficiency notices, respondent has disallowed the deduction of the portions of the "rents" paid to MIT 83 that represent 15 percent of the compensation fee under the employee leasing agreement, the management fee expense, and the interest expense attributable to Machise's accrued late fees.

Other Developments

William Crescenzo, a nephew of Dr. Crescenzo, a petitioner in docket No. 27614-90, had been hired as the controller of Machise during 1982. He considered himself an employee of Machise. He knew, however, that there were companies, which he called "payrolls", whose name appeared on paychecks. He was unaware of the existence of Qulart, and of the fact that large amounts of money were being lent at zero percent interest. He did not understand the purpose of checks coming in and going back to the maker, but at Bucci's direction, he followed written instruction from BBPA.

Frank Peretti succeeded Ingemi as Machise's operations manager after Ingemi's death and later became the company controller. Peretti understood that the various partnerships were his employers, because "every year our payroll company changed." Ingemi had explained to Peretti that the details were complicated, and that Ingemi did not fully understand them himself, but to trust him and "you still have a job." Among

Peretti's responsibilities were changing truck leases and insurance forms to reflect the name of the new employers.

Post-1983 Transactions of MIT 83

MIT 83 closed its bank accounts early in 1984.

Machise owed MIT 83 a compensation fee of 115 percent of the payroll costs. However, under the terms of the employee leasing agreement, this payment could be deferred until July 1, 1994, for a 10-percent-per-year late charge. The MIT 83 agreement differed from the MIT 82 agreement in a minor respect: Machise had no obligation to make any payment whatsoever to MIT 82 for 10 years; however, Machise was obligated to pay interest annually to MIT 83 on the unpaid compensation fee.

On July 1, 1984, MIT 83 billed Machise for 115 percent of the payroll costs. In 1984, 1985, and 1986, Machise made annual payments of $519,960 as deferred payment of the compensation fee plus interest (the 10-percent late charge). After July 1, 1986, the payments were made by MPC. No cash changed hands in these transactions. All the payments consisted of the issuance of non-interest-bearing notes by Machise, and were recorded by journal entries. The purported payments were recorded as passing through MIT 83, coming in as compensation fee income, and exiting as capital distributions to its partners.

The payments to MIT 83 then passed through the partners, going from them as payments on their notes to Qulart. The payments then passed from Qulart to Machise as payment on

Qulart's 12-percent note to Machise.

For the year 1987, MIT 83, like the other partnerships, changed its method of accounting from the cash method to the accrual method.

At the end of 1987, the cash paid and short-term notes issued by the partners in 1983 were still reflected by BBPA's line-of-credit note for $284,300 in favor of MIT 83. On December 31, 1987, Fred applied this note as a deemed distribution to the partners and the further use by them as partial payment of their notes to Qulart.

The following illustration depicts the purported transactions and flows of funds to which MIT 83 was a party.

### Investment Program--MIT 83

A. Investment Phase

1. Partners issue 12-percent notes to Qulart in the amount of $2,888,666, representing ten elevenths of MIT 83's capital. (Fred and Bruce themselves execute $265,000 of such notes by mistake to Machise).

2. Qulart issues a 12-percent note to Machise for $2,888,666.

3. Machise issues a zero-percent demand note to Qulart for $2,888,666.

4. Qulart endorses the $2,888,666 note directly to MIT 83, allegedly at partners' request.

5. By virtue of the endorsement in No. 4, above, the partners are deemed to have invested $2,888,666 in the capital of MIT 83.

6. Pursuant to the employee leasing agreement, MIT 83 advances $2,888,666 to Machise by endorsing the zero-percent demand note to Machise.

7.   In addition to long-term notes, during 1982, partners invest cash of $118,868, and pay $13,902 interest, plus $168,000 in short-term notes.

8.   BBPA retains $46,500 from the partner cash account pursuant to a line-of-credit note with MIT 83, plus $13,699 as professional fees and $5,330 as an "exchange account".

9.   Machise receives $69,800 of partner cash for which it becomes obligated to BBPA under its line-of-credit note.

10.  BBPA becomes obligated to MIT 83 for "receivable" account of $284,300.

B.  Payroll Phase

11.  During 1983, Machise makes weekly transfers totaling $3,061,723 to the MIT 83 payroll account.

12.  Employees and independent contractors are paid by MIT 83 from the amounts transferred to the MIT 83 payroll account by Machise.


D.  Repayment Phase

13.  In 1984, repayment begins with Machise notes of $519,960 to MIT 83 as compensation fee and late charges.

14.  Notes for $519,960 pass through MIT 83 to its partners.

15.  Partners transfer the notes for $519,960 to Qulart as payments on the partners' 12-percent notes.  At the end of 1987, the BBPA line-of-credit note with a balance of $284,300 is also assigned to Qulart to be applied as payment on the MIT 83 partners' notes to Qulart.

16.  The notes for $519,960 then exit to Machise as payments on Qulart's 12-percent note to Machise.

Termination Agreement of MIT 83

On January 1, 1988, Fred prepared a handwritten Termination Agreement to terminate the obligations of MIT 83 and MPC under the employee leasing agreement. The Termination Agreement stated that MPC owed $2,148,764 to MIT 83 under the leasing agreement (the $2,148,764 amount is an error; the amount that should have appeared in the Termination Agreement was $2,135,260), and that MPC offered to pay $1,899,633. MPC proposed to do so by transferring to MIT 83 the note made by Qulart on July 1, 1983, in favor of Machise in the amount of $2,888,666. The balance on the note as of January 1, 1988, was $1,899,633. MIT 83 accepted the offer as full payment and agreed to terminate the agreement. It thus agreed to forego, as a "Contact Renegotiation Fee", some $231,253. No formal assignment of the note was ever made.

Under the Termination Agreement, MIT 83 was required to distribute the note to its partners, who in turn were to direct MIT 83 to assign the note to Qulart in payment of amounts they owed Qulart on their investor notes. No formal distribution of this note was ever made.

Fred signed the Termination Agreement under the heading "Bryen & Bryen, P.A." on behalf of both MIT 83 and MPC. Fred caused MPC to enter into the Termination Agreement with MIT 83 in 1988 in order to remove from its books the "huge note liabilities"--presumably the accrued and unpaid compensation fee. Fred caused the partners of MIT 83 to enter into the termination

agreement with MPC so as to avoid the risk of being required to pay their notes without MPC paying the partners themselves.  Fred intended that all the parties to the MIT 83 employee leasing transactions would be "zeroed out" (with no further liabilities) following the purported termination.  In addition, Fred never considered having Bucci obtain any legal representation or independent advice other than Fred himself concerning the alleged termination.

MIT 83 Income

On its partnership returns for 1985 and 1986, MIT 83 reported partnership taxable income of $519,960.  On its partnership return for 1987, MIT 83 reported partnership taxable income of $797,976.  This amount included one-fourth of the $2,437,470 deferred income that MIT 83 allocated over 4 years due to the change in accounting method imposed by section 448.  To this amount was added "fee income" of $231,253.  This fee income included accrued interest payable from MPC and an item of "portfolio income" in the amount of $42,645.  The partnership's taxable income further reflects a deduction of management fees payable to BBPA in the amount of $42,645--the same amount as the "portfolio income".

On its partnership return for 1988, MIT 83 reported partnership taxable income of $360,236; this amount included one-fourth of the $2,437,470 deferred income that it allocated over 4 years due to the change in accounting method, less $235,627,

which was the "Contract Renegotiation Fee" and other expenses. On its partnership return for 1989, MIT 83 reported partnership taxable income of $1,218,735, which was the remaining one-half of the $2,437,470 deferred income that it had allocated due to the change in accounting method.

For the years 1986, 1987, 1988, and 1989, MIT 83 has filed administrative adjustment requests to reduce its reported taxable income to zero if we determine that MIT 83 is a sham that is not entitled to deduct losses for the prior years. These requests are pending in two of these consolidated cases, docket Nos. 14820-91 and 3551-92. Respondent has agreed that, if we so determine, the requested adjustments would be appropriate.

None of the investors in MIT 83 received any cash return on his or her investment.

MIT 84

On January 1, 1984, Fred and Bruce organized and promoted MIT 84 as a general partnership. In almost all particulars, the organization and operation of MIT 84 were the same as those of MIT 83. BBPA made the general ledger entries of MIT 84 for 1984, and its adjusting journal entries for 1984, 1985, 1987, and 1988.

The 18 individuals and 3 partnerships who participated in MIT 84 were clients of BBPA. There were no prospectuses or offering memoranda or terms sheets for MIT 84.

Like the previous partnerships, MIT 84 agreed to provide all the individual employees and independent contractors required by

Machise to conduct business for the period January 1 through December 31, 1984. Machise and the partnership assumed duties similar to those set forth in the earlier partnership agreements.

The employees and independent contractors were the same employees and independent contractors who had provided their services to Machise before the MIT 84 employee leasing agreement was made. Bucci continued to direct and control the employees. He determined the amount of wages to be paid, did the hiring and firing, took any necessary disciplinary action, and set the hours to be worked.

New independent contractor agreements were made containing the name "MIT 84" as one of the parties and signed by Fred Bryen as "partner" of MIT 84. These agreements imposed rights and responsibilities upon the contractor, the partnership, and the "carrier", which was Machise. For example, under the agreement, both the carrier and the contractor agreed to carry liability insurance. When the lease began, Bucci himself signed as "partnership agent".

The investment program followed a familiar pattern. The 21 partners executed 12-percent notes, in amounts aggregating $3,035,000, to Qulart. The notes required annual payments of interest, with the principal and remaining interest due 11 years after the notes' dates of execution. Qulart executed a similar note to Machise. This amount was equal to ten-elevenths of MIT 84's capital. Machise then lent Qulart $3,035,000 in a zero

percent demand note dated July 1, 1984. Qulart then lent $3,035,000 to the 21 investors in MIT 84. The MIT 84 partners then allegedly directed Qulart to pay the $3,035,000 that they had borrowed from Qulart directly to MIT 84. MIT 84 completed the investment circle by endorsing the $3,035,000 Machise zero-percent demand note back to Machise. Because Machise had its own note back, that note was retired.

In addition to the notes, the investors were required to put up, in the aggregate, $303,500 in cash as the other one-eleventh of their capital investment in MIT 84. None of the investors in MIT 84 initially paid this one-eleventh in cash to MIT 84. Instead, they issued short-term notes to BBPA, which had set up a line-of-credit arrangement with MIT 84. The investors' short-term notes to BBPA were dated January 1, 1984, and were payable July 1, 1984, with interest at the annual rate of 15 percent. The investors fully paid these notes to BBPA in 1984. During 1984, BBPA advanced $182,100 of this amount to Machise, pursuant to a second line-of-credit note, executed by Machise in favor of BBPA.

During 1984, Machise made transfers totaling $4,183,049 to the MIT 84 payroll account. The employees and independent contractors were paid with checks on this account that were signed by Bucci.

In addition to the payroll costs, on December 21, 1984, MIT 84 issued a check to MITA, in the amount of $400,000, as the

total management fee due under the management contract. This amount was recommended by Fred. As with the MIT 83 check for $363,000, the MIT 84 check passed around in a circle to MIT 84, its maker.

Under its cash method of accounting, MIT 84 claimed a net loss of $3,035,000. This was the excess of the $4,194,361 payroll costs over reported partnership income of $1,159,361.[18]

On their individual income tax returns for 1984, the 21 investors in MIT 84 reported Schedule E partnership losses from MIT 84 in proportion to their interests in the partnership. Respondent issued to MIT 84 a notice of final partnership administrative adjustment in which respondent disallowed the entire claimed MIT 84 partnership loss of $3,035,000 for the year 1984.

The employee leasing agreement required Machise to pay a compensation fee to MIT 84 of 120 percent of the payroll costs. This was a 5-percent increase in the compensation fees charged by earlier partnerships. Once again, however, this payment could be deferred for 11 years, until July 1, 1995, for a 10-percent annual late charge.

_____

[18]MIT 84 took into income, as compensation fees, $1,112,394 to reflect that it had received more in advances from Machise than it had lent to Machise. The other income reported by MIT 84 for 1984 consisted of interest income of $46,967. Some $45,525 of the latter amount represented interest paid by BBPA based upon its use of the investors' cash under the line-of-credit note. This interest income was exactly offset by MIT 84's claimed payment of a $45,525 professional fee to BBPA.

For the period January 1 through June 30, 1984, Machise accrued and deducted, for Federal income tax purposes, "rents", of $2,425,881. For the period July 1 through December 31, 1984, Machise/Intercoastal accrued, and deducted for Federal income tax purposes, rents of $2,556,722.

Respondent issued a statutory notice of deficiency to Intercoastal disallowing Intercoastal's claimed deduction for its fiscal year ended June 30, 1984 and 1985, of those parts of its "rents" expense paid to MIT 84 that represent 20 percent of the compensation fee under the employee leasing agreement, the management fee expense, and the interest expense.

MIT 84 closed its bank accounts early in 1985. All its subsequent years' financial operations were effected through non-cash transactions, made by issuing, endorsing, or canceling non-interest-bearing notes, and recorded only by journal entries. These included Machise's payments, in 1985 and 1986, of $546,300, in the form of demand notes, as deferred compensation fee plus interest (the 10-percent late charge). In 1987, MPC made the payment of this amount; it was recorded only by journal entries. These payments took the form of endorsements to the Machise notes; after July 1, 1986, they existed only as bookkeeping entries. They were recorded as passing through MIT 84, coming in as compensation fee income and exiting as capital distributions to its partners, going from them as payments on their notes to

Qulart and then exiting as payments on Qulart's 12-percent note to Machise.

The $303,500 line-of-credit note from BBPA, representing the partners' cash investment, remained unchanged until December 31, 1987, when it was assigned to Qulart to be applied as a payment on the MIT 84 partners' notes to Qulart. That amount passed from Qulart as payment to MPC on Qulart's 12-percent note for $3,035,000 originally issued by Qulart to Machise, now held by MPC. MPC offset the Qulart note against liabilities to BBPA, and the note was canceled. This line-of-credit note receivable was thus treated in the same manner as BBPA's corresponding line-of-credit obligations to MIT 83 for $284,300 and to MIT 82 for $190,000. The net effect was that, as of December 31, 1987, the MIT 82, MIT 83, and MIT 84 partnerships could no longer collect BBPA's $777,800 line-of-credit obligations, which had represented the cash that the partners had paid in and which BBPA and Machise had divided between themselves.

For the year 1987, MIT 84, like the other partnerships, changed its method of accounting from the cash method to the accrual method.

On January 1, 1988, Fred prepared a Termination Agreement to end the obligations of MIT 84 and MPC under the employee leasing agreement. Fred signed the Termination Agreement under the heading "Bryen & Bryen, P.A." on behalf of both MIT 84 and MPC.

The Termination Agreement recited that MPC owed $2,950,256 to MIT 84, and it offered to pay $2,262,253 by transferring to MIT 84 the $3,035,000-note made by Qulart to Machise, now held by MPC, with a current unpaid balance of $2,262,253.  MIT 84 thus settled its receivable for MPC for $688,003 less than it was owed.  This amount was again termed a "Contract Renegotiation fee."  No formal assignment of the note, however, was ever made.

The Termination Agreement also required MIT 84 to distribute the Qulart note for $3,035,000 to its partners, who were to direct MIT 84 to assign that note to Qulart in payment of amounts they owed Qulart on their investor notes.  No formal assignment of that note was ever made.  The partners' investor notes, however, were marked "Paid 1-1-88".

MIT 84 reported partnership taxable income of $546,300 for 1986 and, by virtue of having changed its accounting method, $1,360,877 for 1987, $23,899 for 1988 (reflecting a deduction of the $688,003 Contract Renegotiation fee), and $1,423,786 for 1989.  MIT 84 has filed one of the petitions in this consolidated proceeding (docket No. 3461-92) seeking to have its reported taxable income for those years reduced to zero should we determine that MIT 84 was a sham.  In the event we make such a determination, respondent has agreed that such adjustments would be appropriate.

None of the investors in MIT 84 ever received any cash return on his or her investment in MIT 84.

## MIT 85

On January 1, 1985, Fred and Bruce organized and promoted MIT 85 as a general partnership. Its organization and operation are similar to those of the partnerships previously described.

The four individuals and six partnerships who were investors in MIT 85 were clients of BBPA. BBPA made the adjusting journal entries of MIT 85 for 1985, 1987, and 1988. There were no prospectuses or offering memoranda or terms sheets for MIT 85. Some of the prospective investors in MIT 85, however, were given a four-page document, prepared by BBPA, which described the tax advantages of investing in MIT 85 and made projections to the end of the partnership term. The document stated, in part:

> In 1985, each unit investor will report a loss of $100,000. During the next 10 years, each unit investor will report taxable income ranging from $3,286 in 1986 to $11,560 in 1995. In 1996, each unit investor will report taxable income of $41,263.

MIT 85 and Machise, and MPC, newly inserted as a "subcontractor",[19] entered into an employee leasing agreement, dated January 1, 1985, under which MIT 85 would provide all of the individual employees and independent contractors required by Machise to conduct its business for the period January 1 through December 31, 1985.

---

[19]Fred testified that he inserted MPC as a subcontractor in order to deter questions by the creditors of Machise about Machise's large liabilities to the partnerships. Additionally, inserting MPC, in which Bucci was the principal partner, exposed Bucci's assets to possible claims of MIT 85 in the event of Machise's inability to pay its liabilities.

The MIT 85 agreement was similar to those of the earlier partnerships. The employees and independent contractors were the same employees and independent contractors who had earlier provided their services to Machise before the MIT 85 employee leasing agreement was made. After this agreement, Bucci still directed and controlled the employees.

The 10 partners executed notes to Qulart in face amounts aggregating $2,160,000. This aggregate amount was equal to 80 percent of MIT 85's capital. The notes bore interest at the annual rate of 15 percent. They were to be repaid in 10 level annual payments. Qulart issued a similar note to Machise, which then issued a $2,160,000 demand note dated July 1, 1985, to Qulart. This note circled from Qulart to the 10 investors who allegedly directed Qulart to endorse the note directly to MIT 85.

In addition to issuing the notes, the investors were required to put up, in the aggregate, $540,000 in cash as the other 20 percent of their capital investment in MIT 85.[20] The investors paid substantial amounts of this cash to BBPA during 1985. BBPA was supposed to advance to MIT 85 the cash required of the investors in MIT 85. BBPA issued neither cash, nor a check, nor notes to accomplish this advance. The advance,

[20]The employee leasing agreement for the previous partnership, MIT 84, had required MIT 84 to advance ten-elevenths of its invested capital to Machise. The MIT 85 employee leasing agreement, however, required MIT 85 to advance all its invested capital to Machise. This totaled $2,700,000--$2,160,000 in notes from its partners and $540,000 in cash.

however, was recorded by a journal entry.

The total cash paid by the investors under the subscription agreements in 1985 was $334,096.80, plus $16,255 interest. Of this amount, BBPA was to retain some 20 percent as a promoter's fee from Machise. The balance apparently went to Machise, although some amounts that BBPA credited to Machise were in the form of setoffs.[21] This "promoter's fee" arrangement for BBPA was new; it replaced the line-of-credit arrangement whereby BBPA--and, through it, Machise--had divided the cash invested by the partners in the earlier partnerships.

Machise again made weekly transfers to the payroll accounts to cover the Machise payroll. During 1985, these totaled a net amount of $3,508,786. The employees and independent contractors were paid with MIT 85 checks drawn on this account and signed by Bucci.

In addition to the payroll costs, on December 24, 1985, MIT 85 issued a check to MITA, in the amount of $400,000, as the total management fee due under the management contract. This amount was recommended by Fred. As with the MIT 84 check for the same amount, the MIT 85 check passed around in a circle to MIT 85, its maker.

_____

[21]Fred testified that, because all the investors' cash was to go from MIT 85 to Machise it was not necessary for BBPA to forward all of the investors' cash to Machise. Fred recalled that BBPA merely reduced an obligation that Machise had to BBPA in lieu of forwarding some of the investors' cash to Machise.

Under its cash method of accounting, MIT 85 claimed a net loss of $2,700,000, which was the excess of the $3,512,527 payroll costs over reported partnership income of $812,527, an amount that includes compensation fee income and a relatively small amount of interest earned.[22]

On their individual income tax returns for 1985, the 10 investors in MIT 85 reported Schedule E partnership losses totaling $2,700,000 from MIT 85 in proportion to their interests.

Respondent issued a notice of final partnership administrative adjustment to MIT 85, wherein respondent disallowed the entire claimed MIT 85 partnership loss of $2,700,000 for the year 1985.

For the period January 1 through June 30, 1985, Machise/ Intercoastal accrued and deducted, on its consolidated income tax return, "Rents" of $2,110,835. For the period July 1 through December 31, 1985, Machise/Intercoastal accrued, and deducted for Federal income tax purposes, an additional $2,104,042.[23] For the

_____

[22]The $3,512,399 amount "advanced" by Machise to the MIT 85 payroll account exceeds the $2,700,000 amount "advanced" by MIT 85 to Machise under the employee leasing agreement. See supra note 20. Some $808,786 of the difference between the amounts allegedly advanced by MIT 85 and those advanced to MIT 85 was recorded as a prepayment of the compensation fee on Dec. 31, 1985, and is reflected in MIT 85's income for that year. Additionally, the payroll figure includes some $3,741 in interest.

[23]Intercoastal/Machise filed an amended Form 1120 for the fiscal year ended June 30, 1986, in order to reflect a change in its net operating loss carryover from a prior year.

two periods, these amounts totaled $4,214,877, or 120 percent of the amounts paid by MIT 85 for payroll costs.

Respondent issued a statutory notice of deficiency to Intercoastal. Therein respondent disallowed Intercoastal's claimed deductions for the fiscal years ended June 30, 1985 and 1986, of those parts of its "rents" expense paid to MIT 85 that represent 20 percent of the compensation fee under the employee leasing agreement. Respondent also disallowed the management fee expense and the interest expense.

MIT 85 closed its bank accounts early in 1986. On July 1, 1986, after the payroll costs were paid, MIT 85 billed Machise for 120 percent of their total amount, as the compensation fee. By that time, however, MIT 85 should have billed MPC, which, the day before, had purchased all of the financial paper assets of Machise that had been generated in the yearly employee leasing agreements to which Machise was a party.

In subsequent years, MIT 85 engaged in noncash transactions, made by issuing, endorsing, and canceling notes, and recorded by journal entries. These included Machise's execution of demand notes without interest to MIT 85 in the amount of $412,722 as deferred payment of the compensation fee plus interest (the 10-percent late charge). As with MIT 84, the payments went from Machise to MIT 85, then to its partners, then to Qulart, and finally back to Machise. Thus, on its partnership return for 1986, MIT 85 reported partnership taxable income of $412,722,

which it called compensation fee income, and no expenses.

In 1987, MPC issued a similar note, which circled through the partners, the partnership, and Qulart, and back to MPC. MIT 85 reported partnership taxable income of $1,865,187 on its partnership return for 1987. This amount consisted of $1,571,520 (one-half of the $3,143,039 deferred income that it was allocating over 2 years due to the change in accounting method), plus $293,667, which it called fee income, and which represented the accrual of interest payable from MPC, and no expenses.

On January 1, 1988, Fred prepared a Termination Agreement to end the obligations of MIT 85 and MPC under the employee leasing agreement. Under the terms of the employee leasing agreement, MPC owed $3,023,984 to MIT 85. MPC offered to pay $2,116,938 by transferring to MIT 85 the $2,160,000 note made by Qulart to Machise, now held by MPC, with a balance, including accrued interest, of $2,116,938.

The Termination Agreement recited that, after assignment of the note, the balance due to MIT 85 was $907,045.98, but that MIT 85 had agreed to reduce that amount by $151,531.98 and to cancel the 10-percent annual late charge. Fred calculated the net amount due to MIT 85, some $755,514, so that it would equal the amount that he had projected as the aggregate income to the MIT 85 investors.

Additionally, under the Termination Agreement, MIT 85 was required to distribute the note to its partners who were to

direct MIT 85 to assign the note to Qulart in payment of amounts they owed Qulart on their investor notes. No formal assignment of this note, however, was ever made. The partners' notes were nevertheless marked "Paid 1-1-88".

Fred signed the Termination Agreement under the heading "Bryen & Bryen, P.A." on behalf of both MIT 85 and MPC.

On its partnership return for 1988, MIT 85 reported partnership taxable income of $1,419,986, consisting of $1,571,520 (the remaining one-half of the $3,143,039 deferred income that was originally allocated over 2 years due to the change in accounting method), less $151,532, which it called a "Contract Renegotiation fee". This amount corresponds to the amount that MIT 85 agreed to forgo in exchange for early payment to terminate the employee leasing agreement, less an accounting fee to BBPA of $1.

For the years 1986, 1987, and 1988, Fred, as vice president of BBPA, the tax matters partner of MIT 85, has filed an amended Form 1065 as a protective administrative adjustment request. Therein he seeks to have the income reported by MIT 85 for those years reduced to zero, in the event that we determine MIT 85 to be a sham, not entitled to deduct the losses for 1985. Those claims are pending in docket No. 3453-92. As with the other partnerships, respondent has agreed that such adjustments would be appropriate if we so determine.

After the termination, MPC still owed MIT 85 some $755,514.

Fred recommended that the partnership distribute this $755,514 receivable to its partners. The partners were thereafter listed as creditors against the estate in bankruptcy of Anthony S. and Miriam A. Bucci (Bucci was the 99.999-percent partner of MPC; Intercoastal held the other .001-percent interest).

The Notice of Commencement of the Bucci bankruptcy case stated: "At this time there appear to be no assets available from which payment may be made to unsecured creditors." No representative of BBPA attended the Creditors' Meeting in the Bucci bankruptcy proceeding held on July 20, 1994. Fred explained that it is "an absolute waste of time to attend * * * these creditors' meeting when we know that there are no assets available to be distributed." BBPA recommended that the partners claim the amounts owed to them as bad debt deductions for the year 1994.

None of the investors in MIT 85 ever received any cash return on his or her investment in MIT 85.

### MIT 86

Fred and Bruce organized and promoted MIT 86 as a general partnership at the beginning of 1986. It also was very similar to the previous partnerships. BBPA prepared financial statements for MIT 86 as of December 31, 1986, and made adjusting journal entries for 1987 and 1988.

MIT 86 had nine partners--six individuals, two partnerships and one corporation. All were clients of BBPA. There were no

prospectuses or formal offering memoranda or terms sheets for MIT 86. Some of the prospective investors in MIT 86, however, received a four-page document prepared by BBPA. The document described the provisions for investing in MIT 86 and made taxable income and cash-flow projections to the end of the partnership term.

The arrangements for MIT 86 followed the familiar pattern. MIT 86, Machise, and MPC entered into an employee leasing agreement, dated January 1, 1986, under which MIT 86 would provide all the individual employees and independent contractors required by Machise to carry on business for the period January 1 through December 31, 1986. The employees and independent contractors were the same employees and independent contractors who had earlier provided their services to Machise before the employee leasing agreement was made. After this agreement, Bucci still directed and controlled the employees.

The nine partners executed notes to Qulart in amounts aggregating $3,080,000. This amount was equal to 80 percent of the capital of MIT 86. The notes bore interest at a rate of 15 percent per annum and were to be repaid in annual level installments. Qulart issued a similar note to Machise, which issued a $3,080,000 demand note dated July 1, 1986. Backed by a series of reciprocal obligations, this note circled from Qulart back to the nine investors, who allegedly directed Qulart to endorse the note directly to MIT 86.

In addition to the notes, the investors were required to put up, in the aggregate, $770,000 in cash as the other 20 percent of their capital investment in MIT 86. BBPA was supposed to advance to MIT 86 the cash required of its investors in MIT 86. BBPA issued neither cash, nor a check, nor notes to accomplish this advance, which was, however, recorded by a journal entries on the books of BBPA and MIT 86.

The nine investors signed General Partnership Subscription Agreements by which they agreed to pay the 20 percent cash part of their investment in 10 monthly installments at 15 percent interest, commencing on January 1, 1986. The MIT 86 investors paid the $770,000 to BBPA in cash or by offsets in 1986.

Machise made weekly transfers to the MIT 86 First Jersey payroll accounts to cover the Machise payroll costs. During 1986, these transfers totaled a net amount of $3,983,476. The employees and independent contractors were paid with MIT 86 checks signed by Bucci.

Although the books and records of MIT 86 and MITA reflect payment of a management fee of $400,000 by MIT 86 to MITA, no check for that amount appears in the record.

Under its cash method of accounting, MIT 86 claimed a net loss of $3,850,000. This was the excess of the payroll costs over reported partnership income.[24]

---

[24]The employee leasing agreement required MIT 85 to advance
(continued...)

On their individual income tax returns for 1986, the nine investors in MIT 86 reported Schedule E partnership losses from MIT 86 in proportion to their interests.

Respondent issued a notice of final partnership administrative adjustment to MIT 86, in which respondent disallowed the entire claimed MIT 86 partnership loss of $3,850,000 for the year 1986.

For the period January 1 through June 30, 1986, Machise/ Intercoastal accrued and deducted, on its consolidated income tax return, "rents" of $1,925,000.

Respondent issued a statutory notice of deficiency to Intercoastal disallowing Intercoastal's claimed deduction for fiscal year June 30, 1986, of those parts of its rents paid to MIT 86 that represent 20 percent of the compensation fee under the employee leasing agreement, the management fee expense, and the interest expense.

MIT 86 closed its bank accounts early in 1986. Like the other partnerships, in its subsequent years MIT 86 engaged in noncash transactions, made by issuing, endorsing, and canceling notes, and recorded by journal entries. Thus, MPC issued MIT 86

---

(...continued)
all its invested capital, notes of $3,080,000 plus cash of $770,000, to Machise. The $133,476 excess of the amounts allegedly advanced to MIT 86 over the $3,850,000 advanced by MIT 86 was recorded as a prepayment of the compensation fee on Dec. 31, 1986.

a demand note in the amount of $585,511,[25] without interest, dated July 1, 1987.

The demand note bore endorsements that were recorded by journal entries as capital distributions from MIT 86 to its partners and then as payments on their notes to Qulart. As a result of these endorsements, the notes were credited against the partners' notes to Qulart, then applied as Qulart's payment of its note to Machise. The partners in MIT 86 made no cash payments in 1987 on their notes to Qulart.

For the year 1987, MIT 86 changed its method of accounting from the cash method to the accrual method. On its partnership return for 1987, MIT 86 reported partnership taxable income of $4,855,505, which consisted of $4,652,314 (the deferred income that it reported due to the change in accounting method), plus $203,191, which it called fee income and which represented the accrual of interest payable from MPC, and no expenses.

For the year 1987 Fred, as vice president of BBPA, the tax matters partner of MIT 86, has filed an amended Form 1065 as a protective administrative adjustment request. Therein he seeks to have the income reported by MIT 86 for the year 1987 reduced to zero, in the event that we determine MIT 86 to be a sham, not entitled to deduct the losses claimed for 1986. The claim is

---

[25]The amount of $585,511 appearing on the note was incorrect and should have been $588,511. The transaction was recorded on the books of MIT 86 and MPC in the amount of $588,511.

pending in docket No. 3462-92.  Respondent has agreed that such an adjustment would be appropriate if we so determine.

On January 1, 1988, Fred prepared a Termination Agreement to end the obligations of MIT 86 and MPC under the employee leasing agreement.  MPC owed $4,266,993.53 to MIT 86 pursuant to the employee leasing agreement.  Under the Termination Agreement, MPC offered to pay $3,175,000 to MIT 86 by transferring to MIT 86 the $3,080,000 note made by Qulart to Machise, now held by MPC, with a balance, including accrued interest, of $3,175,000.67.  No formal assignment of this amount took place, however.

The Termination Agreement also recited that, after MPC assigned the Qulart note to MIT 86, the balance due to MIT 86 would be $1,091,992.86.  The Termination Agreement further provided that MIT 86 had agreed to reduce that balance by $14,685.86 and to cancel the 10-percent annual late charge.  Fred computed the net amount due to MIT 86, some $1,077,307, so that it would equal the amount that he had projected as the aggregate income to the MIT 86 investors.

Additionally, under the Termination Agreement, MIT 86 was required to distribute the Qulart note to its partners.  They were to direct MIT 86 to assign that note back to Qulart, the note's maker, in payment of amounts they owed Qulart on their investor notes.  No formal assignment of this note, however, was ever made.

Fred signed the Termination Agreement under the heading "Bryen & Bryen, P.A." on behalf of both MIT 86 and MPC. None of the investors in MIT 86 received a return on his or her investment.

Fred caused MPC to enter into the Termination Agreement with MIT 86 in 1988 in order to relieve it of its liabilities to MIT 86. Fred caused the partners of MIT 86 to enter into the Termination Agreement with MPC in 1988 so as to minimize their exposure to risk on their notes.

On its partnership return for 1988, MIT 86 reported a loss of $14,687; this is the amount that MIT 86 agreed to forgo in exchange for early payment to terminate the employee leasing agreement), plus an accounting fee to BBPA of $1.

After the termination, MPC still owed MIT 86 some $1,077,307. Fred recommended that the partnership distribute this $1,077,307 obligation to its partners. The partners were thereafter listed as creditors against the estate in bankruptcy of Anthony S. and Miriam A. Bucci.[26]

_____

[26]While the $1,077,307 allegedly owed by MPC to the investors in MIT 86 was still on the books at the time of the trial herein, Fred conceded that he will probably recommend that the debt be written off as an uncollectible loss by the investors.

## W & A Payroll Service

On July 1, 1986, Fred and Bruce organized and promoted W & A Payroll Service (W & A) as a general partnership. BBPA prepared a schedule for cash receipts of W & A through March 31, 1988, and a schedule of W & A's cash disbursements through June 30, 1988. BBPA made adjusting journal entries as of January 1, 1987, and January 1, 1988.

W & A was in substance similar to the earlier partnerships. There were, however, some notable differences, chiefly the absence of any checks or notes in the partnership's financial transactions.

As with the previous partnerships, W & A used the calendar year as its tax year and the cash method of accounting from its inception until December 31, 1987. It also had the same address as BBPA.

W & A had a bank account at the First Jersey Bank/South (First Jersey) Bank, which was the payroll account. Andrew Bryen, Fred's brother and a partner in W & A, was an authorized signatory on the W & A payroll account at the First Jersey Bank. Andrew has an eighth-grade education. He owns half of a meat company, of which Fred was the vice president. With respect to Fred's financial directives, Andrew "trusted anything Fred said, and if he told me--if he sent something over for me to sign, I'd sign it. I wouldn't even look at it. I'd just sign it." Andrew

was nominally a managing partner for W & A, but he was not aware that he held that position. He did not engage in management of W & A.

Fred had installed Andrew as the managing partner of W & A in an attempt to comply with a provision of section 469, added to the Internal Revenue Code by the Tax Reform Act of 1986. Fred had believed that a tax shelter partnership could continue to use the cash method of accounting if investors with more than a 65-percent interest--here, allegedly, Andrew--participated in the partnership's activity. It later became clear that Fred's interpretation was not correct.

W & A originally had six partners, consisting of four individuals and two corporations. All were clients of BBPA. There were no prospectuses or formal offering sheets for W & A.

On September 26, 1986, W & A, MPC, BBPA, and Machise entered into an employee leasing agreement, prepared by Fred. This agreement was much less detailed about the parties' rights and responsibilities than the prior versions had been. Nevertheless, as with the prior partnerships, W & A was to provide all the individual employees and independent contractors required by Machise to conduct its business for the period January 1 through December 31, 1987. The employees and independent contractors were the same employees and independent contractors who worked for Machise before the W & A employee leasing agreement was made.

The six W & A investors signed General Partnership Subscription Agreements in which they agreed to invest $4 million in cash before January 1, 1987. The initial capitalization of W & A was accomplished by BBPA lending the entire $4 million in capital to the six W & A investors. The six investors in W & A did not execute promissory notes for their subscription amounts to BBPA. BBPA did not issue a promissory note to W & A for the initial capitalization, but it did create an account payable to W & A for $4 million.

The employee leasing agreement required W & A to deposit $3 million with BBPA, "the escrow agent", on January 1, 1987, so that BBPA could fulfill its obligations under the employee leasing agreement (the $3 million figure was incorrect and inconsistent with the partnership's and partners' subscription agreements; it should have been $4 million as the entire capitalization of W & A). W & A purportedly deposited $4 million in BBPA. No checks or notes were exchanged in these transactions; however, the transactions involving the shift of $4 million between BBPA, the investors in W & A, and W & A itself were all recorded in journal entries.

Machise was required to pay to MPC, and MPC was required to pay to W & A, 105 percent of the payroll costs of the employees and independent contractors. This payment was the compensation fee. It was due and payable weekly as payroll costs were

incurred by W & A. MPC, however, had the election to defer payment. If MPC made such an election, the unpaid balance of the compensation fee plus the late charge computed to January 1, 1988, was to be paid in 36 equal monthly installments with 10 percent interest, with the first payment due on January 31, 1988, and the balance due in installments on the last day of each month thereafter.

The employee leasing agreement provided that, upon presentation of the weekly payroll register approved by MPC, BBPA would release and deposit directly into W & A's payroll bank account 125 percent of the gross pay. The funds so deposited originated in Machise and passed through BBPA as the "escrow agent". Although the actual flow of funds was from Machise to BBPA to W & A, journal entries recorded the alleged transactions to include MPC and Bucci. Thus, the journal entries showed the funds going from Machise to MPC as an advance, then from MPC to Bucci as a capital distribution, then from Bucci to BBPA as a loan to BBPA, and then from BBPA to W & A.

The employees and independent contractors were paid with W & A checks stamped with the signature of Andrew Bryen (Andrew Bryen physically signed three W & A checks in 1987).

One of the employees paid with W & A checks was Loretta Wilcox, a secretary with Machise. She had been hired by Bucci in September 1980, after she had filled out a formal employment

application. She could not identify any of the partnerships, MIT 80 through 86, nor W & A. She acknowledged that W & A appeared as payor on her 1987 paychecks and on the Form W-2 filed with her Federal income tax return for that year. However, she was not aware that she had been a leased employee.

Machise considered the amount spent by W & A, some $3,586,269 in 1987, as the amount of payroll costs incurred under the employee leasing agreement. In 1987, W & A reported a loss of $3,586,269, and a separate item of portfolio income of $113.

On their individual income tax returns for 1987, the investors in W & A reported on Schedule E the partnership losses from W & A in proportion to their interests. Respondent issued a notice of final partnership administrative adjustment to W & A, in which respondent disallowed the entire claimed loss of $3,586,269 for the year 1987.

In 1987, the New Jersey Department of Labor canceled the unemployment tax accounts of the partnerships whose accounts could be reached under the applicable statute of limitations. The Department of Labor transferred credits for the funds that had been ostensibly paid by the partnerships from the partnerships' accounts to Machise. The Department did so because it had determined Machise to be the party that was liable for unemployment tax contributions.

By 1988, Fred had decided that his assumption or legal conclusion underlying the W & A arrangements--that W & A could

use the cash basis method of accounting--had been a "mutual mistake". Therefore, as of January 1, 1988, W & A changed its method of accounting from the cash method to the accrual method. There was no formal termination agreement for the W & A employee leasing program. Instead, a flurry of journal entries closed out W & A's existence. Journal entries for January 1, 1988, reflect that W & A had a issued a credit to MPC in the amount of $397,431 and reversed a late charge of $199,202. This caused W & A's receivable balance from MPC to equal $3,586,603.[27]. Additional journal entries indicate that W & A then assigned its $3,586,603 receivable from MPC to BBPA in exchange for a receivable from BBPA in that amount. This assignment brought the total amount due from BBPA to W & A to $4 million.

On the same day, a W & A journal entry recorded the distribution of this $4 million receivable from BBPA to its partners. The partners were deemed to have received this capital distribution pro rata. BBPA reflected this distribution by reclassifying the $4 million payable as being payable to the W & A partners, not to W & A itself. At this point, since the W & A partners owed BBPA $4 million pursuant to their

---

[27]For the year 1987, after the payroll and other costs had been paid, W & A had issued a bill to MPC in the amount of $3,984,034, plus accrued interest--a late charge--of $199,202, for a total receivable due of $4,183,236. The amount accrued by Machise was more than the 105 percent of the actual payroll costs required by the employee leasing agreement. The charge of $3,984,034 was the result of Fred's estimating the payroll costs as $3,794,318 and adding 5 percent--in the amount of $189,716.

subscription agreements and since BBPA now owed the same amount to the W & A partners, BBPA caused these offsetting balances to be canceled.

The other entities involved with W & A also recorded offsetting journal entries to cancel the assets and liabilities associated with their W & A transactions.[28]  Pursuant to these journal entries, W & A was terminated because it owned no assets and owed no liabilities.

On its partnership return for 1988, W & A reported partnership taxable income of $3,586,156.  This amount consisted of $3,984,034, which W & A had billed as a "compensation fee", less various net expenses of $447 and less $397,431, which Fred called "Contract Termination Expense".  This was the amount that W & A agreed to forgo in exchange for early payment to terminate the employee leasing agreement.

For the year 1988, W & A has filed an administrative adjustment request, seeking to have its reported income of $3,586,156 for 1988 reduced to zero if we determine that W & A is

---

[28]For example, at the time of the offsets BBPA owed Bucci $3,771,517 as a loan of the borrowed payroll costs.  Meanwhile MPC, Bucci's entity, owed $3,586,603 to BBPA, which had accepted W & A's account receivable from MPC in that amount.  Moreover, another Bucci entity, MIT Payroll Service, owed $184,712 to BBPA (including a miscellaneous 1988 expense of $500).  Since MPC and MIT Payroll Service were controlled by Bucci, BBPA made a journal entry offsetting its $3,771,517 payable to Bucci against its $3,771,315 receivables from MPC and MIT Payroll Service, resulting in an alleged net amount payable to Bucci of $202. This payable was later eliminated when the MIT Payroll Service entity was terminated.

a sham, as respondent contends. That claim is pending in docket No. 3221-93. Respondent has agreed that, in the event we so determine, the requested reduction is appropriate.

None of the investors in W & A ever received any return from their participation in W & A.

The Investors

In promoting the various partnership as tax shelters, Bruce told the investors that the shelters were "set up on a cash basis, there was a partnership and the loss would flow through to them on their personal return." Bruce advised the investors that an economic return on their investment could be paid quickly or "it could be deferred for 10 years, and they would be paid right after the beginning of the eleventh year, that it was up to the payer, to the operating company."

One of the investors in MIT 82, as well as other of the MIT shelters partnerships, was Anthony Schweiger (Schweiger). Schweiger is a mortgage banker. He was aware that the partnerships in which he invested were employee leasing arrangements with 1-year terms. He was aware of no partnership meetings, however, nor of any partnership votes.

Schweiger and the other investors received occasional memoranda about developments during the year with respect to their investments. A typical memorandum reads as follows:

TO:  Mr. Anthony Schweiger

FROM:  Bruce Bryen

RE: MIT 82

On July 1, 1984, Machise Interstate Transportation Company, Inc. paid MIT 82 $473,458.00 consisting of the following:

| | |
|---|---|
| Repayment of balance of advance at July 1, 1983 | $120,919.90 |
| Interest due on above at 10% to July 1, 1984 | 12,091.99 |
| Late charge on Fee due at July 1, 1983 (10% x $2,880,595.08) | 288,059.51 |
| Partial payment of fee | 52,386.60 |
| | $473,458.00 |

Your share of this payment was $7,698.50 which we used to pay the annual installment due on your note on July 1, 1984. The interest portion of this payment which you may deduct on your 1984 income tax return is $4,730.15

The remaining balance due on your note after the July 1, 1984, payment is $ 44,333.15.

For financial statement purposes the market value of your interest in MIT 82 at July 1, 1984 was $50,500.00.

We will be sending you an accounting (Form K-1) soon after the end of the year which will contain all of the information needed for your 1984 income tax return.

Please call me if you have any questions about MIT 82.

Schweiger received no financial statements for Machise. He had a great deal of faith in Fred, and, as he explained, did not "dot the I's and cross the T's in a very sophisticated manner about asking for financial statements * * * and things like that."

Schweiger understood that he had signed a note for which he was liable, but he received no demand for repayments. He was instead informed that the note had been paid off. He was not aware of the termination agreements.

Schweiger's primary consideration in participating in the MIT partnerships was to obtain tax benefits.  He had previously invested in three other tax shelters promoted by Fred and Bruce through BBPA.  Schweiger identified one of these shelters as "P&G which was the school bus operation, Pat & Gordon".

Charles Thompson (Thompson) was another investor in the MIT shelters.  He was told that his taxes would be reduced, but he does not recall any representation being made about investment profits.  He recalls no partnership meeting nor partnership votes.  He was not aware that he was a general partner in the partnerships.  He did not understand how his notes were paid off, nor did he receive news of the termination of the employee leasing arrangement.

Thompson did not have regular meetings with the accountants at BBPA; he only went to them with his tax materials for purposes of preparing his income tax returns.

Another of the investors in W & A was Alexander M. Churchill (Churchill), a civil engineer.  BBPA was the accountant for Churchill's engineering business, and Churchill's tax preparer.  Churchill saw Bruce two or three times a year, with respect to Churchill's individual tax matters.  Bruce had induced him to invest in W & A, as well as other earlier tax shelters.  Churchill participated for "investment purposes and also to shelter some of my income."  In addition to the MIT tax shelter partnerships, the Bryens also brought other tax shelters to

Churchill's attention.

Bruce did not explain to Churchill the significance of being a general partner in the MIT partnerships.  Churchill knew of no partnership meetings, nor was he consulted on partnership operations.  He did not know the other partners.  He did not understand the accounting mechanisms of the partnerships, but he relied upon Bruce.  Asked specifically about his participation in MIT 82, Churchill did not recall being consulted before termination of that partnership's employee leasing agreement.

Before trial in these cases, Fred informed the investors in writing that the trial was in the offing.  A typical letter from Fred to an investor advises--

> If you are called as a witness, Steve Jozwiak will prepare you for trial.  In general, he will tell you to tell the truth and try not to become confused.

> Steve will expect you to testify to the true facts that you knew that you were at risk for $137,500.00 and that you expected to earn 13% on your investment which would be more than enough to pay your note.  In addition you had the protection of your tax savings but you knew that you would have to pay taxes on the income that you would be reporting over the 10 year period. Steve will also expect you to testify that you expected Bryen & Bryen P.A. to manage your investment and MIT 82 and to take care of all of the details without consulting you.

## OPINION

Three aspects of the employee leasing programs structured by Fred Bryen are in issue in these consolidated test cases. Respondent's first set of determinations denies, for the years 1980 and 1982, to the partners, and in subsequent years (1983,

1984, 1985, 1986, and 1987) to the partnerships, deductions for claimed losses attributable to payments of Machise's payroll costs. Respondent's second set of determinations denies, for the years 1983, 1984, 1985, and 1986, deductions for the interest alleged by the Pettisani petitioners to have been paid on their 1982 note to Machise. Respondent's third set of determinations denies Intercoastal, which filed consolidated returns with Machise, deductions for the years 1982 and 1983 for any amount of the "overrides" on its payroll costs, the "management fees", and the interest accrued on its alleged borrowings.

We hold that petitioners are not entitled to the deductions at issue. Our holdings are based on the overall conclusion that the transactions giving rise to the claimed deductions had neither economic substance nor a profit objective.

I.  Neither the Partners Nor the Partnerships Are Entitled to
    Loss Deductions Based Upon Payment of Machise's Payroll
    Costs

The initial question we must answer is whether the partners (for 1980 and 1982) and the partnerships (for 1983-87) may deduct, as partnership expenses, the payroll costs for the years in issue.

A.  The Requirement of Economic Substance

"The incidence of taxation depends upon the substance of a transaction. * * * To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective

administration of the tax policies of Congress."  Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945).

The Court of Appeals for the Third Circuit, to which all these cases are appealable, has recently applied the principle that the substance of a transaction, and not its form, governs its tax consequences.  As that court explained,

> The general rule on sham transactions in this circuit is well-established:  "If a transaction is devoid of economic substance . . . it simply is not recognized for federal taxation purposes, for better or for worse. This denial of recognition means that a sham transaction, devoid of economic substance, cannot be the basis for a deductible loss."  [United States v. Wexler, 31 F.3d 117, 122 (3d Cir. 1994) (quoting Lerman v. Commissioner, 939 F.2d 44, 45 (3d Cir. 1991), affg. Fox v. Commissioner, T.C. Memo. 1988-570).]

See, in this regard, Foxman v. Commissioner, 352 F.2d 466, 469 (3d Cir. 1965), affg. 41 T.C. 535 (1964); see also Weller v. Commissioner, 270 F.2d 294, 296 (3d Cir. 1959)(quoting Gregory v. Helvering, 293 U.S. 465, 469 (1935)), affg. 31 T.C. 33 and Emmons v. Commissioner, 31 T.C. 26 (1958), in which the Court of Appeals for the Third Circuit noted that the Supreme Court had refused to give effect to "`an elaborate and devious form of conveyance masquerading'" as a legitimate transaction.  The activities there described were found to be "`a mere device which put on the form * * * as a disguise for concealing its real character'".

Petitioners bear the burden of proving that the challenged transactions were not sham transactions, devoid of economic substance.  Rule 142(a); Sheldon v. Commissioner, 94 T.C. 738,

753 (1990); <u>Arrowhead Mountain Getaway, Ltd. v. Commissioner</u>, T.C. Memo. 1995-54 (taxpayer bears burden of disproving determination in FPAA in case filed under TEFRA partnership provisions).

1.   <u>The Relationship of the Employees and Independent Contractors to Machise and to the Partnerships</u>

The "real character" of the transactions at issue, as displayed by the entire record, is that Machise, and not the partnerships, incurred and paid the payroll costs of the workers who performed services for Machise.  Accordingly, Machise, and not the partnerships, is entitled properly to deduct those costs as ordinary and necessary business expenses.  See <u>Whipple v. Commissioner</u>, 373 U.S. 193, 202 (1963); <u>Madison Gas & Elec. Co. v. Commissioner</u>, 72 T.C. 521, 566-567 (1979), affd. 633 F.2d 512 (7th Cir. 1980).

Conventional employee leasing business arrangements have presented some interesting tax issues, but we have no occasion to reach them here.  Some employers contended that, by using employee leasing arrangements, they could avoid application of the Code provisions that require qualified retirement plans to make provisions for lower-paid employees.  See, e.g., <u>Burnetta v. Commissioner</u>, 68 T.C. 387 (1977).  To deal with those issues, Congress added section 414(n) and (o) to the Code.[29]

---

[29]In 1982, Congress added sec. 414(n), Tax Equity & Fiscal Responsibility Act of 1982, Pub. L. 97-248, sec. 248(a), 96 Stat.
(continued...)

The issues underlying the enactment of section 414(n) and (o) have no bearing on this case.  The purported employee leasing arrangements at issue here are not the otherwise presumably valid leasing organizations addressed in section 414(n).[30]  The arrangements in the cases at hand instead fall within the category of arrangements we have called "generic tax shelters".  See Rose v. Commissioner, 88 T.C. 386, 412-413 (1987), affd. 868 F.2d 851 (6th Cir. 1989).

Petitioners argue that modern employee leasing arrangements have modified strict employer-employee roles.  The evolution of such arrangements, however, does not lend substance to the activities of the lessor partnerships in the cases before us.  The parties have asked the Court to take judicial notice of Willey, The Business of Employee Leasing (2d ed. 1988).  Dr.

---

[29](...continued)
526, whose general purpose was to treat certain leased employees as employees of the recipient of their services for purposes of the qualified plan requirements.  H. Conf. Rept. 97-760, at 79 (1982), 1982-2 C.B. 600, 679.  In 1984, Congress added sec. 414(o), Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 526(d)(1), 98 Stat. 875, granting authority to the Secretary to issue regulations deemed necessary to prevent employee leasing or other arrangements from being used to avoid statutory employee benefit requirements.  In the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1146, 100 Stat. 2491, Congress amended sec. 414(n) to expand further the qualified plan restrictions on the use of leased employees.

[30]By a parity of reasoning, the organization and use of Intercoastal and MIT Personnel in efforts to maximize qualified plan benefits for Bucci and Ingemi and effectuate other business purposes have no bearing on the issues in this case, which concern the efforts to use the MIT partnerships to create tax benefits for investors and Intercoastal/Machise.

Willey's introduction, <u>id.</u> at 2, to his book explains the

operation of conventional employee leasing arrangements:

> In employee leasing arrangements, two legally
> separate employers share some, or all, of the employer
> responsibilities with the same employees. Leased-
> employees are employed by the leasing employer, which
> pays their wages and benefits, but whose employees also
> report for work at the utilizing business. There their
> work activities are directed by the utilizing employer.
> These workers do the work of the business of the
> leasing employer and the business of the utilizing
> employer. The employer responsibilities may be
> allocated between the employers, by mutual agreement.
> * * *

As Dr. Willey explains, the employer responsibilities may be

allocated between the employers, by mutual agreement. Here,

however, notwithstanding the written employee leasing agreements,

none of the responsibilities changed. There is no indication

that, as provided in the agreements, Machise provided the

partnerships with estimates of the number of employees or

contractors it would need to carry on its business. Nor is there

any indication that the partnerships undertook in any substantive

way to provide Machise with the employees, independent

contractors, equipment, or antecedent biographical information

called for in the agreement. We have seen no instance in which

the partnerships undertook to "control and direct the performance

of the services of the individuals", despite the explicit

reservation of the right to do so contained in each of the

agreements. Nor have we seen any attempt by the partnerships

either to "instruct each individual as to his work hours and the

nature of his duties", or to "determine the contractor to be used" to carry out Machise's business.

To the contrary, Machise continued to act through its owner employees, Bucci and Ingemi, and, after Ingemi's death, Bucci alone. Bucci and Ingemi, and not the partnerships, made the work assignments to the employees and independent contractors. Bucci and Ingemi directed and controlled the employees. Bucci and Ingemi determined the amount of wages to be paid, did the hiring and firing, took any necessary disciplinary action, and set the hours to be worked. Machise, and not the partnerships, provided work space and equipment to the workers. Cf. Professional & Executive Leasing, Inc. v. Commissioner, 89 T.C. 225, 232 (1987), affd. 862 F.2d 751 (9th Cir. 1988).

Dr. Willey, supra at 6, also lists a number of employer functions usually taken over by an employee leasing company. These functions include issuing paychecks, payroll management, paid leave management, payroll tax deposits, recruitment, enrollment in benefits, maintenance of employee benefits, and benefit claims administration. Here, there is no showing that the partnerships actually performed any of these functions. Machise continued to perform the services usually provided by employee leasing companies. The partnerships' participation was limited to the use of their names on checks, forms, or transmittal documents.

Dr. Willey also explains, <u>id.</u>, that in a typical employee leasing arrangement a subscribing company places its regular workforce on the leasing firm's payroll. He adds, significantly: "The employees have to agree to this too." <u>Id.</u> In the present case, the employees did not submit formal employment applications to the partnerships, nor did they explicitly consent to the execution of the employee leasing agreements. They were not consulted or informed about the employee leasing agreements, and they were for the most part unaware of the existence of their putative new employers. As indicated by the testimony of Ms. Wilcox, Machise's workers did not ascribe any significance to the appearance of the partnerships' names on their pay checks. Indeed, the fact that the workers were hired by Machise Interstate Transport (which was often called "MIT") may help explain why the workers paid little attention to the fact that their checks were drawn, for example, on an account in the name of "MIT 86".

Dr. Willey also writes that "The leasing arrangement with the subscriber begins with the assumption that this will be a long-term affiliation". <u>Id.</u> In this case, however, the assumption was that there would be only short-term 1-year arrangements with each of the successive partnerships. The employees would remain with the subscribing company while changing employers--that is, the partnerships--every year.

Finally, Dr. Willey indicates that "Most employee leasing firms are charging anywhere between three and eight percent of employee gross wages". Id. at 217. Here, the partnerships charged "overrides" of between 15 and 20 percent--more than twice the going rates--in exchange for services that were merely illusory.[31]

We conclude that Machise, through Bucci and Ingemi, filled the role ostensibly claimed by the partnerships. Machise operated its business without the aid of the partnerships. None of the partnerships, and none of their partners, undertook any substantive activities with respect to Machise's employees or independent contractors. Machise, and not the partnerships, was the employer and the party responsible for paying the payroll costs. Accordingly, Machise, and not the partnerships, was entitled to claim those costs as a deduction of ordinary and necessary business expenses.

Petitioners' arguments to the contrary are unavailing. They seek support from cases that impose liability for employment tax obligations on the party that controls wage payments, e.g., Evans

---

[31]Fred has insisted that the inflated "overrides" included interest paid to the partnerships for their "advances" of payroll costs. We have found that the partnerships' "advances" are as illusory as their services. The alleged interest components of the overrides are also illusory. In addition, there is no indication by Dr. Willey that a hallmark of conventional employee leasing arrangements is that the subscribing company will defer the reimbursement of payroll costs to succeeding years.

v. Internal Revenue Service, 607 F.2d 1237 (9th Cir. 1979).
Petitioners argue that because the employees and independent
contractors were paid from accounts in the names of the
partnerships, the partnerships must be deemed to be the
employers. Petitioners are wrong. Their argument fails to take
into account that Machise, through Bucci and Ingemi, determined
who would be paid and how much, provided Machise money for the
payroll accounts, and signed the paychecks drawn on those
accounts. Machise controlled the wage payments. The use of the
partnerships' names on the payroll accounts is a facade that does
not evidence an employment or other service provider relationship
between the partnerships and the worker providers of the actual
services that were needed to carry on the business of Machise.

There were numerous other attempts to insert the name of the
partnership into Machise's business. These attempts did not,
however, impose any genuine responsibilities upon the
partnerships. The appearance of the partnerships' names on some
of the agreements with independent contractor truckers does
not affect our conclusion. A reading of those agreements shows
that the operative provisions generally described the reciprocal
rights and responsibilities of the truck driver and the
"carrier", Machise. To the extent any rights or obligations
devolved upon the partnerships under those agreements, we regard
it as significant that Bucci--and none of the partners--signed as
"partnership agent".

Nor can petitioners derive comfort from correspondence between officials of the New Jersey Department of Labor and the partnerships concerning their liabilities for employment taxes. The New Jersey Department of Labor subsequently canceled the unemployment tax accounts of the partnerships. The Department transferred credits for the funds that had been ostensibly paid by the partnerships from the partnerships' accounts to the Machise account with the Department. The Department did so because it ultimately determined that Machise was the party liable for unemployment tax contributions. Its ultimate determination, once it caught on to the charade, strengthens our conclusion that the partnerships were not the employers, and exposes the lack of significance of the earlier correspondence.

Petitioners have also failed to show that there was any substance in the inclusion of the partnerships' names, as "participants", on some of the employees' pension plan documents. The plan documents reveal that the employees' pension plan existed long before the partnerships were formed. Even after the partnerships were formed, Bucci and Ingemi provided Machise's money to fund the pension payments, as they had done for the other payroll costs. Bucci, and not the partnerships, decided where the pension deposits would be invested, and Machise's controller prepared the quarterly financial statements for the plan. Petitioners have not shown that the partnerships performed any meaningful role with respect to the pension payments or the

administration of the plan.

In sum, the operative facts of these cases show that the substance of the partnerships' employee leasing arrangements is that Machise, and not the partnerships, was the employer of the employees and the party who hired the independent contractors for purposes of deducting the payroll costs at issue.

### 2. Lack of Economic Substance of the Employee Leasing Agreements

Petitioners also argue that the substance of the transactions has been given economic effect by the execution of the financing agreements.  Petitioners again are wrong.  These agreements lack economic substance and are ineffective, for Federal tax purposes, to change the character of the transactions at issue.[32]

In Levy v. Commissioner, 91 T.C. 838, 856 (1988), we listed a number of "particularly significant" factors in determining whether a financial transaction has economic substance apart from tax benefits.  These factors include the presence or absence of arm's-length negotiations, the relationship between sales price and fair market value, the structure of the financing, the degree

---

[32]In focusing on the transactions at issue, we find it unnecessary to resolve related questions such as whether or when the investors formed valid partnerships.  See Commissioner v. Culbertson, 337 U.S. 733 (1949).  Nor need we decide whether the partners' claimed losses exceeded the bases of their partnership interests.  See CRC Corp. v. Commissioner, 693 F.2d 281 (3d Cir. 1982), affg. in part and revg. and remanding in part Brountas v. Commissioner, 73 T.C. 491 (1979).

of adherence to contractual terms, and the reasonableness of the income and residual value projections.  See also <u>Helba v. Commissioner</u>, 87 T.C. 983, 1005-1011 (1986), affd. without published opinion 860 F.2d 1075 (3d Cir. 1988).

<u>Levy</u> concerned a sale and leaseback of computer equipment; the present case concerns the financial arrangements purporting to undergird an employee leasing program.  Although the relationship of sales price to fair market value and questions of residual value are not relevant to our inquiry, the other factors provide a useful framework for evaluating the employee leasing and financial agreements at issue.

### a.  Structure of the Financing

The structure of the financing is the most important factor in evaluating the claimed economic substance of the employee leasing arrangements.

The true nature of the financing was straightforward.  There were two types of transaction that occurred in cash, and, in the context of this case, had economic substance.  The first was the partners' investment of cash in tax shelters.  BBPA and Machise divided this cash between themselves.[33]  The second type of

---

[33]Petitioners do not contend that the investors may deduct this cash itself.  We note that a taxpayer is not entitled to deduct out-of-pocket cash losses under sec. 165(c)(2) arising from a tax shelter that lacks economic substance.  <u>Mahoney v. Commissioner</u>, 808 F.2d 1219, 1220 (6th Cir. 1987), affg. <u>Forseth v. Commissioner</u>, 85 T.C. 127 (1985); <u>Hoffpauir v. Commissioner</u>, T.C. Memo. 1996-41.

substantive transaction was the payment of Machise's cash to the employees and independent contractors who were its service providers. These payments took the form of checks signed by Machise's principals, drawn upon an account funded by Machise, but maintained in the name of the partnership.

Petitioners contend that the transactions were much more complicated. And, as Fred designed them, they were very complicated indeed. In general terms, petitioners claim that Machise lent millions of dollars to the partners. The partners then invested this money in the partnerships, which in turn circled this money, as an "advance", back to Machise. For the first half of the calendar year, Machise again advanced this money, in weekly amounts, to the partnerships. The partnerships then used this borrowed money to meet Machise's payroll costs. During the second half of the calendar year, the partnerships allegedly reimbursed Machise for the advances and continued to meet Machise's payroll costs. Because the partnerships had no income of their own for the years they made these payments, they claimed losses, which their partners deducted on their own returns.

In subsequent years, this investment circle was reversed. Once again, no cash changed hands. The claimed payments took the form only of notes or bookkeeping entries. Machise thus allegedly made payments to the partnerships as its compensation fee and an additional annual late charge. The amounts of these

payments were deemed distributed to the partners.  The partners, in turn, were credited with making payments in these amounts on their original loans from Machise--or from Machise through Qulart.

These elaborate arrangements among Machise, Qulart, BBPA, the partners, and the partnerships existed in form only.  They were examples of the classic circle transactions that lack economic reality, to which we have refused to give effect.

For example, in Drobny v. Commissioner, 86 T.C. 1326 (1986), the taxpayers contributed cash and the proceeds of short-term loans to research-and-development tax shelters.  Some $900,000 of these amounts--allegedly deductible research and development costs--were distributed to the bank account of a corporation known as "Isle".  On December 27, 1979, the amounts were then advanced to subcontractor corporations called FAL and ARL.  The promoters of the tax shelters then used the funds to purchase commercial debt instruments.  When, 2 weeks into the new year, these instruments matured, the proceeds were repaid to the taxpayers.  This Court said:  "The transactions surrounding the circular flow of the $900,000 proceeds of the bank loans had no substance for tax purposes".  Id. at 1346.  The taxpayers in that case had contended that the ARL and FAL corporations could have broken the circle and prevented the taxpayers from receiving their repayments.  That would have been an event of economic substance.  We disagreed with the taxpayers' argument, however,

and explained:

> This argument is meritless because both corporations were controlled by * * * [a promoter] * * *; while in theory such interference might have occurred, it was realistically impossible.  Therefore, we conclude that the transactions that resulted in the circular flow of the $900,000 proceeds of the bank loans were shams entered into solely to create the illusion of research and experimental expenditures, while in substance insuring that no part of such funds would be so used. [Id. at 1346.]

In Karme v. Commissioner, 73 T.C. 1163 (1980), affd. 673 F.2d 1062 (9th Cir. 1982), the taxpayer, in an effort to reduce his taxes, purportedly borrowed money to purchase stock in a corporation.  The purchase would take place "if and when" a public offering of that corporation's stock occurred.  The resulting transactions, designed by Harry Margolis, all occurred on December 16 and 17, 1969.  They began with the taxpayer's borrowing $600,000 from the Union Bank in California.  That bank then wired that amount to the account of a company named World Minerals at Banco Popular in the Netherlands West Antilles.  The $600,000 then moved to another account, held by an entity named Alms, at the Banco Popular.  Alms then "loaned" that amount to the taxpayer by transferring it to the taxpayer's Union Bank account.  On December 17, 1969, Union Bank used the amount to repay the taxpayer's loan.  The taxpayer wrote a check to Alms for $60,000 as interest, but only after receiving a $50,000 loan from another Margolis entity named Anglo-Dutch Capital.  (The $10,000 difference was later credited to the taxpayer for his use

in an investment vehicle known as the "Karme Trust".) The taxpayer, however, deducted the $60,000 interest payment from his income taxes for 1969. On the facts of the case, we found that the loan transaction was a sham. We stated:

> When the transfer of $600,000 from Alms to petitioner is viewed as a part of the entire money movement transaction, it becomes apparent that Alms was not a true lender but was a mere conduit in the circulation of the Union Bank loan proceeds back to petitioner and the Union Bank. * * * [W]e believe that no purpose, from anyone's standpoint, has been shown for the transfer of the $600,000 from World Minerals back to Alms. There is no reason to presume that the World Minerals-Alms transaction was conducted at arm's length since both entities were effectively controlled by Margolis. * * * Although the payment from Alms to petitioner was designed to appear to be a loan, its main effect was simply to complete the circuit so that petitioner could repay the Union Bank Loan. * * * [Id. at 1186-1187; fn. ref. omitted.]

Also instructive is United States v. Clardy, 612 F.2d 1139 (9th Cir. 1980), in which the Court of Appeals affirmed the conviction of a tax shelter promoter. One of the counts against the promoter was based on the following three-step circular arrangement:

> 1. On December 30, 1971, the promoter directed that a check for $30,000, payable to his company EPI, be drawn on a client trust account, No. 13030, called "Associates". The check bore a legend stating that it was "prepaid interest" of the client. The client's balance in the Associates account was $180.86. The check was nevertheless immediately deposited in the EPI account.

> 2. On the same day, EPI drew a check on its account for $30,000 payable to "Capital Three", which is another name for Associates. The check was deposited into a separate Associates account, No. 13022.

3.  Also on the same day, Associates drew a check on account No. 13022 made payable to the Associates Trust account, No. 13030.  It is deposited into that account.

The client claimed a deduction of the $30,000 prepaid interest on his 1971 Federal income tax return.  The promoter was convicted for assisting in the preparation of a false tax return. The promoter argued on appeal that the interest deductions were lawful and that the evidence was insufficient to sustain a conviction.  The Court of Appeals disagreed and affirmed the conviction.  It stated:  "The most important aspect of the operations here performed is that there was no substance behind the forms employed."  Id. at 1152.  It found the promoter's arguments to be "without any merit."  Id. at 1153.

The investment circles in the cases before us share important similarities with Drobny, Karme, and Clardy.  Like those cases, the cases before us employed circular obligations with no economic effect.  Fred, as the promoter, designed and controlled the programs so that they would be isolated from commercial reality.  They generated substantial tax benefits, with no events of economic substance.  As in Drobny, Karme and Clardy, the circular transactions before us cannot sustain the tax deductions claimed by petitioners.[34]

---

[34]These considerations apply to all the partnership losses at issue.  For the years 1982 through 1986, a substantial portion of the partnerships' first-year losses consisted of "professional and management fees".  These were the management fees paid to

(continued...)

b. <u>Termination Agreements</u>

Petitioners contend that the employee leasing arrangements were valid commercial transactions because, ultimately, Machise would have to pay the partnerships more in "overrides" than they had invested. Indeed, the passage of time increased the apparent prospect that Machise would have to make actual cash payments on its obligations. This development would have been consistent with economic substance, but it was not a happy prospect for the participants. The offsetting paper transactions would no longer suffice to cancel each other out. Machise would ultimately owe more, in terms of the compensation fees, than it had borrowed. As for the partners, if Machise encountered financial difficulties, they might be required to make good on their notes to Machise by paying Machise's creditors, without having received any offsetting revenue from Machise.

When it appeared that there might be actual enforcement of these notes or other adverse economic and tax effects, Fred intervened with a fix. He came up with the termination agreements, which he designed and entered into on behalf of the parties so that everything would "zero out". He signed the

---

[34](...continued)
Intercoastal or MITA in amounts ranging from $363,000 to $400,000, and/or professional fees paid to BBPA ranging between $14,300 to $45,525. As was the case with the partnerships' obligations to Machise and Qulart, these payments consisted of money circles or offsets. They had no economic substance, and no tax effect.

termination agreements under the heading "Bryen & Bryen, P.A." on behalf of both the partnerships and MPC. Fred explained "the whole reason they [the partners] did it is to get rid of the risk. They owed $2 million and if Machise [MPC] did not pay the compensation fee, these partners would be after me with guns." The partners' notes were uniformly marked "Paid 1-1-88".

The partners themselves had nothing to do with the terminations; the partners who testified were not aware until later that the termination agreements had been signed and that the terminations had happened. Their liabilities were canceled, along with any hope that they would recover any money from their investments.

The termination agreements also relieved the entity variously known as Intercoastal/Machise/MPC of any meaningful liability. The agreements terminated its obligations to MIT 80, MIT 82, MIT 83, and MIT 84 entirely. The termination agreements thereby deprived the employee leasing arrangements of any vestiges of economic substance that they might conceivably have had. When Fred executed the termination agreements, he may have prevented the investors from coming after him "with guns". He also, however, cut out any ground for claiming that the transactions had any valid tax effects.

With respect to MIT 85 and MIT 86, there were no termination agreements. Fred nevertheless knew by the turnaround time, when the notes payable to those partnerships would become due, that

neither MPC nor anyone else could pay them.  This was so because

Bucci, MPC's 99.999-percent partner, was sunk in bankruptcy.  And

although Intercoastal held a theoretical partnership interest in

MPC, there was no suggestion that it could pay the multimillion-

dollar liabilities owed to the partnerships.  Finally, W & A

never acquired any semblance of economic substance before it was

terminated as a result of what Fred called a "mutual mistake".[35]

Petitioners insist that the structure of the financing

reflects the true nature of the transactions.  They retrace each

of the partnerships' alleged operations in exhaustive detail.

They insist that the transactions at issue actually happened,

because Fred recorded them, and that, because the transactions

happened, they had economic substance.  For support, petitioners

refer to the language of the stipulations.  Many of these

stipulations describe, in the abstract, the form of the

transactions as if those transactions had actually occurred.

Thus, for example, petitioners point to language such as that

contained in paragraph 680 of the stipulations.  That paragraph

---

[35]We realize, in the case of MIT 80, that there was a
contention that the partners received half the stock of Machise
as recognition of Machise's liabilities to it.  We do not take
this contention seriously.  Fred unilaterally declared Machise
insolvent; he unilaterally valued its stock in the hands of MIT
80 at $250,000; he induced Bucci to turn over that stock in a
transaction in which Bucci was not represented by counsel; and he
told the partners that they were ultimately entitled to a
$1,154,000 loss on the transaction.  In view of the sham nature
of the other transactions, we decline to accept Fred's
uncorroborated and self-serving contentions that MIT 80 acquired
a stock interest in Machise that had any value.

recites: "During 1983, MIT 83 paid out $2,528,416 to employees and independent contractors and taxing authorities." Petitioners ignore respondent's express reservation that, "in stipulating to transactions, [she] is only stipulating to the form of such transactions and does not stipulate that there was any substance to such transactions. Respondent reserves the right to challenge particular stipulated transactions." At trial, Fred conceded that, in making such stipulations, the parties were merely reciting the form of the transaction.

We thus do not accept petitioners' insistence on brief that the form described in the stipulations amounts to a concession of commercial or economic reality. The transactions described cannot be given effect for tax purposes, regardless of how particular paragraphs of the stipulations may be read in isolation.

Petitioners also argue that business transactions similar to theirs do have economic substance. They cite cases for the proposition that offsetting payment obligations are not per se invalid for tax purposes. Petitioners point to Frank Lyon Co. v. United States, 435 U.S. 561 (1978), apparently assuming that their situation is in some way comparable. In that case, State and Federal regulations precluded a bank from financing its headquarters building by conventional means. Therefore, according to a plan, the Frank Lyon Co. obtained the financing, took title to the headquarters building, and leased it back to

the bank. The bank's rental payments were equal to Frank Lyon's principal and interest payments on the mortgage. The bank had an option to repurchase the building by taking over the mortgage and paying Frank Lyon's initial $500,000 investment. The Supreme Court approved Frank Lyon Co.'s deduction of depreciation, interest, and other expenses associated with its ownership of the building. The Court concluded that the company's purchase was "a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached". Id. at 583-584.

Petitioners here have failed to establish that their employee leasing transactions had economic substance similar to the arrangement in Frank Lyon. Under the Frank Lyon criteria, the transactions before us were not "imbued with tax-independent considerations". They are in fact characterized by "tax-avoidance features that have meaningless labels attached".

Petitioners cite other cases of legitimate financial arrangements in which an investor engaged in a "circular off-setting group of obligations". See, e.g., Emershaw v. Commissioner, 949 F.2d 841, 848 (6th Cir. 1991), affg. T.C. Memo. 1990-246. In such cases the taxpayer proved that he "minimized potential cash-flow problems by arranging that income from his investment will cover the obligations he has incurred in making

the investment."  Id. at 847.

In these other cases there were no deliberately-contrived circles of offsetting payments, established solely for tax purposes, such as those here.  In the cases at hand, the deliberate circular matching obligations, the lack of arm's-length dealing, the lack of purposive activity by the partnerships, Fred's untrammeled exercise of the ability to terminate the transactions as he deemed fit, the lack of documentation, and the overriding tax motivations of the transactions at issue all combine to "take this case well beyond an unadorned availability of rental payments to cover note obligations."  Waters v. Commissioner, 978 F.2d 1310, 1317 (2d Cir. 1992), affg. T.C. Memo. 1991-462.

In sum, the financial structure of the employee leasing partnerships before us presents only an image of genuine lending, borrowing, and investment transactions.  The transactions were shams.  They consisted of prearranged circular offsetting deals, which, coupled with the termination agreements and Bucci's bankruptcy, effectively precluded any claim that they possessed economic substance.

c.  Arm's-Length Negotiations

Arm's-length bargaining is an obvious characteristic of commercially valid transactions.  There is no evidence of arm's-length negotiations in any of the employee leasing arrangements at issue.  Instead, the participants let Fred and Bruce arrange

all aspects of the transactions.

Fred has claimed that Bucci, on behalf of Machise, engaged in hard bargaining in striking a deal to lease the employees and independent contractors. We can find no substantiation for Fred's self-serving claims. Bucci appeared at the trial of this case, but it was soon obvious that he was not competent to present an accurate description of the events at issue. Medical evidence submitted after the trial suggests that, prior to and during the trial, Bucci was suffering from Alzheimer's disease. The record lacks any indication that Bucci had been fully cognizant of the facts of the employee leasing transactions when they occurred. If Bucci were the tough negotiator Fred claimed him to be, we believe that there would be at least some written records reflecting his active participation in the employee leasing negotiations. There are none. We would also expect that other responsible officials of Machise would be familiar with the transactions that their corporation had entered into. The testimony of Crescenzo, the controller, and Peretti, the operations manager, tells a different story. They plainly did not understand the specifics of the employee leasing programs.

We are left with the conclusion that Bucci, and the rest of Machise's personnel, left everything to Fred, relying on his representations that the employee leasing arrangements were too good to pass up. Fred purported to explain to the Court that Machise fell into a "gold mine. * * * they didn't have to pay

their payroll for 11 years under this arrangement."  We believe that Fred told Bucci much the same sort of thing.  The most plausible explanation for Bucci's cooperation is that Fred presented him with a program whereby Machise would ostensibly both lend and borrow the cash to meet its weekly payroll.  As a result, Machise would then be able to deduct 115 or 120 percent of those payments, as "rents" including the "override".  Machise would also be able to deduct the various management fees.  In addition, Machise and BBPA would split investor cash between them, based upon the "line-of-credit" notes, or, later, upon BBPA's sharing the cash after taking out its "promoters' fee". Presented with these lucrative possibilities, Bucci let Fred handle the details.  Bucci had only to sign the documents put before him and otherwise do what Fred told him to do, while otherwise continuing to run the Machise business as before.

Nor was there any hard bargaining by the other participants, the investor partners.  The testimony of these investors provides direct evidence of the same type of reliance on BBPA that Bucci had in Fred.  Dr. Crescenzo professed to having "a lot of faith" in the Bryens, and left the matter of his investment entirely up to Bruce.  Schweiger, an investment banker, conceded that he had a great deal of faith in Fred, and therefore he did not "dot the I's and cross the T's in a very sophisticated manner about asking for financial statements * * * and things like that."  Churchill testified that he did not understand how the partnerships worked

but relied upon Bruce to look after his interests.

Moreover, the dealings between Fred or Bruce and the partners reveal no explanation of Machise's financial position and prospects, as well as a conspicuous failure of the partners to ask about those prospects, as would have been appropriate if there was any actual expectation that Machise would eventually pay its deferred obligations to the partnerships. Fred has insisted that the partners were kept fully aware of all that went on with respect to the partnerships. The record shows otherwise. We accept the investors' testimony that they only met infrequently with BBPA and knew very little about what was going on in their partnerships.

There is thus no credible evidence of arm's-length negotiations. The evidence instead demonstrates that Fred, with Bruce's help, ran the whole show. Fred and Bruce induced their clients to participate in the employee leasing arrangements with the promise of substantial tax advantages. The participants-- Bucci, Machise, the investors and the partnerships--did as they were told by Fred and Bruce and accepted the figures provided in memoranda from BBPA. They understood that Fred and Bruce would attend to the details, but Fred, and to some extent Bruce, were the only persons who understood those details.

d.  Adherence to Contractual Terms

A transaction that has economic substance will be characterized by enforcement of the agreements between the parties.  The parties' failure to enforce the provisions of their agreements is evidence that the transaction does not conform to economic realities.  Helba v. Commissioner, 87 T.C. at 1011; cf. Arrowhead Mountain Getaway, Ltd. v. Commissioner, T.C. Memo. 1995-54 (finding of sham transaction supported by showing that promoter was "notably careless and unbusinesslike" in documenting and altering legal relationships of the partnership).

The cases before us present numerous instances of sloppy documentation and of arbitrary alterations of the rights of the participants.  For example, the date for MPC to pay the "Contract Renegotiation fee" to MIT 80 was set to be January 1, 1992.  This was 1 day past the date that the MIT 80 partnership, according to the partnership agreement, was to terminate.

With respect to MIT 82, Machise purportedly lent $3,075,000 to the 29 partners in exchange for their notes.  The employee leasing agreement, however, provided that the amount would be $3 million.

The MIT 83 partners were required to execute personal notes in substantial amounts to Qulart.  As partners in MIT 83, Fred and Bruce themselves executed similar notes totaling, in the aggregate, $265,000.  These notes, however, were made out to Machise, and not to Qulart, because of an apparent error.

On February 26, 1983, the New Jersey Department of Labor pointed out another mistake. It wrote to "William Bryen and Bruce Bryen, t/a MIT 83", advising that Machise, not MIT 83, was listed as the insured on the Standard Workmen's Compensation and Employer's Liability Insurance policy for the period July 1, 1983, through July 1, 1984.

Moreover, the $2,148,764 asserted to be owing by Machise to MIT 83 in the Termination Agreement is an error; the amount that should have appeared in the termination agreement was $2,135,260.

After the 1985 payroll costs were paid, MIT 85 billed Machise for 120 percent of the their total amount, as the "compensation fee." It should have billed MPC.

With respect to MIT 86, Fred prepared a note in payment of the compensation fee. The amount of $585,511 appearing on the note was incorrect and should have been $588,511. The transaction was recorded on the books of MIT 86 and MPC in the amount of $588,511.

Finally, with respect to W & A, the employee leasing agreement required W & A to deposit $3 million with BBPA. The $3 million figure was wrong; it should have been $4 million as the entire capitalization of W & A. Additionally, Fred terminated the existence of W & A itself as a "mutual mistake", when he realized that his interpretation of section 469 had been ill-founded.

The significance of petitioners' failure to adhere to their

agreements is compounded by their reliance upon bookkeeping entries alone to substantiate the economic effect of the programs.

Parties to complex million-dollar transactions normally insist upon adequate documentation of their rights and responsibilities. In this case, however, Fred created journal entries or bookkeeping entries to reflect transactions that he alone perceived to have happened. In most instances, those transactions did not happen in fact; the only substantiation for them is Fred's self-serving testimony and the bookkeeping entries that he created.

Confronted with the absence of notes or other evidence of the claimed transactions, Fred has claimed that they were not needed. Fred was asked at trial how Machise gave the MIT 82 partners $3,075,000 without transferring cash or property or executing any document. Fred explained: "The transaction occurred, it was recorded on the books of all the parties with a full explanation and you don't really need notes, checks or cash or property." Asked to amplify, Fred said

> No advance, no notes, nothing had to be done. One person--two people or 35 people agreed that there would be a transaction that occurred. For one reason or another, that's what they wanted to do. I knew it occurred, all the parties knew it occurred, all the parties agreed to the transaction. As the accountant, I recorded the transaction.

Fred is wrong in ignoring the significance of his repeated failures to provide documentation or other substantiation for the

transactions at issue. "On questions concerning the taxability of income, we are to be guided by facts and not by bookkeeping entries." Commissioner v. North Jersey Title Ins. Co., 79 F.2d 492, 493 (3d Cir. 1935). We therefore disregard journal entries that are inconsistent with economic reality. Nissho Iwai Am. Corp. v. Commissioner, T.C. Memo. 1985-578, affd. without published opinion 812 F.2d 712 (2d Cir. 1987). Here, in many instances, there was no documentation to substantiate the bookkeeping entries, and no one seemed to care.

For example, bookkeeping entries indicate that MIT 80 advanced 100 percent of its $2.4 million capital by endorsing checks to Intercoastal in that amount on July 29, 1980. MIT 80 did not in fact endorse any such checks to Intercoastal.

Similarly, as of December 31, 1982, the books of MIT 82 showed that it had advanced $3,075,000 to Machise. Other than journal entries, however, there are no documents showing that this amount was ever paid.

BBPA was supposed to advance the partners' cash investment to MIT 86. BBPA issued neither cash, nor a check, nor notes to accomplish this advance. Such an advance was, however, recorded by a journal entry.

The entire financial existence of W & A was a matter of book entries. Specifically, its transactions purportedly shifting $4 million (recorded by mistake as $3 million) between BBPA, the investors in W & A, and W & A itself were all recorded by journal

entries.  These transactions were unwound in the same way.  None of these transactions were accompanied by transfers of cash, the drawing of checks, or the issuance of notes.

Additionally, the termination agreements often called for assignments of notes in order to carry out their provisions, but often no such assignments were made.

In circumstances such as these, when the validity of financial transactions is called into serious question, reliance upon bookkeeping entries will not suffice.

e.  Reasonableness of Income Projections

We have examined the reasonableness of projections of income expected to emanate from a transaction as a means of evaluating its economic substance.  See, e.g., Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 204-207 (1983), affd. in part, revd. in part, and remanded 752 F.2d 89 (4th Cir. 1985).  Here, petitioners insist that the partnerships' contemplated gross profits, in terms of 15 or 20 percent "overrides" and 10 percent late fees, were reasonable and consistent with contemporary standards in the leasing industry.  Petitioners further point out that some of the payments, including compensation fees and late fees, were reported as taxable income by the partnerships.

Petitioners' contentions that the transactions had economic substance, in the form of actual earnings that resulted in taxable income in the later years of the partnerships, are without merit.  The partners only lost money on these deals.

Indeed, Fred and Bruce promised them tax losses, but the only loss they incurred was the economic loss of their cash payments, which were absorbed by fees and other payments to BBPA and Machise.

Fred structured the employee leasing transactions so that the lessor partnerships would be on the cash basis. Under the employee leasing agreements, the partnerships could not seek income in the form of "rents" for their leased employees until after the year in which the partnerships allegedly furnished and paid those employees. Thus the transactions were structured so that the partnerships were guaranteed a loss, in every instance, in the first year of operation. Their partners used their pro rata shares of that loss to reduce, or "shelter", unrelated taxable income. This sheltering of income is the only justification for establishing a structure in which the investors would automatically be deprived of any income in the first year of operation. As we have said:

> Petitioners argue that under the * * * transaction, there was a reasonable prospect for a profit. This argument conveniently overlooks the fact that in the critical year--the loss year--there was no prospect for any profit, for any other result would have destroyed the raison d'etre for entering into the * * * transaction in the first place. * * *

Glass v. Commissioner, 87 T.C. 1087, 1174 (1986), affd. sub nom. Herrington v. Commissioner, 854 F.2d 755 (5th Cir. 1988), affd. sub nom. Yosha v. Commissioner, 861 F.2d 494 (7th Cir. 1988), affd. sub nom. Ratliff v. Commissioner, 865 F.2d 97 (6th Cir.

1989), affd. sub nom. <u>Kirchman v. Commissioner</u>, 862 F.2d 1486 (11th Cir. 1989), <u>Killingsworth v. Commissioner</u>, 864 F.2d 1214 (5th Cir. 1989); affd. sub nom. <u>Keane v. Commissioner</u>, 865 F.2d 1088 (9th Cir. 1989), affd. sub nom. <u>Friedman v. Commissioner</u>, 869 F.2d 785 (4th Cir. 1989), affd. sub nom. <u>Dewees v. Commissioner</u>, 870 F.2d 21 (1st Cir. 1989), affd. sub nom. <u>Kielmar v. Commissioner</u>, 884 F.2d 959 (7th Cir. 1989), affd. sub nom. <u>Lee v. Commissioner</u>, 897 F.2d 915 (8th Cir. 1989).

The fact that the partnerships' tax returns reflected taxable income in later years does not help petitioners. Tax returns are not proof of the statements made therein. <u>Halle v. Commissioner</u>, 7 T.C. 245 (1946), affd. 175 F.2d 500 (2d Cir. 1949). The income reported by the partnerships was merely the unwinding of the circular transactions. The partnerships' journal-entry recordings of income did not reflect the receipt of actual income. The unwinding of the circular transactions provided no increase in wealth, no <u>gain</u>, either to the partnerships or their partners. Genuine income represents economic gain, whether calculated under the Haig-Simons definition, see Haig, The Concept of Income--Economic and Legal Aspects, in Readings in the Economics of Taxation 54 (Musgrave & Shoup eds. 1959); Simons, Personal Income Taxation 50 (1938), or as expansively adumbrated by the Supreme Court in <u>Commissioner v. Glenshaw Glass Co.</u>, 348 U.S. 426, 429-431 (1955). Indeed, it is the lack of economic reality in the partnerships' reported income

that explains and justifies respondent's willingness to concede that such income should be reduced to zero in the years affected.

Petitioners, however, do not agree that their income was a sham, for if they did so, they would be required to agree that their deductions were shams as well. In order to mitigate the tax effects of this income, the partners instead extended their losses into those later years. The did so either by investing in other MIT partnerships, or, as Schweiger and Churchill have testified, in other tax shelters promoted by Fred.[36]

The possibility of genuine future earnings for the partnerships was virtually nonexistent as a practical matter. Machise could wait for up to 11 years to repay its "compensation fee". At that time, Machise would owe 115 percent of the amount borrowed, plus late charges that, at least for some of the partnerships, would have accumulated at a rate of 10 percent per annum for 10 years. Even though the interest was simple interest, the partners would be still be faced with collecting from an entity that could be on a precarious footing. Accumulation of the late charges over the permitted 10-year

---

[36]Schweiger identified one of those shelters as "the school bus operation, Pat & Gordon". This Court, in Batastini v. Commissioner, T.C. Memo. 1987-378, disallowed deductions claimed by investors in that shelter, which was promoted by BBPA. One of the participants in the school bus tax shelter was an entity named Pat and Gordon, Inc. Our findings in that opinion show that among the shareholders of Pat & Gordon were Anthony Bucci, Joseph Ingemi, and Richard Adamucci, who, as noted above, also acquired interests in MIT 80.

period would effectively double the obligation. Moreover, Machise would be faced with paying compensation fees for a period of several consecutive years, as each investor partnership's debts became due. Fred and Bruce, however, provided no meaningful basis upon which the investors could expect that Machise would be able to pay its debts after 1 year, to say nothing of paying 10 years' worth of late charges. The evidence noticeably lacks any contemporary forecast or analysis of Machise's earning power or of any provision that it was making to create a fund that would enable it to pay its purported obligations. Fred did not provide for any such analysis or require any such provision, and the partners did not ask for one.

In circumstances such as these, the courts have concluded that any prospect of repayment is illusory. As the Court of Appeals for the Second Circuit has stated in a similar situation: "At the end of twelve years, the * * * [creditors] could look only to the corporate assets * * * to collect amounts still owed on the notes. A trier could thus easily find that by then the corporate cupboards would be bare." Barrister Associates v. United States, 989 F.2d 1290, 1299 (2d Cir. 1993). So it was in the cases at hand, and we so find.

f.  Insertion of Other Entities

In determining a lack of economic substance, we have found significance in the fact that a promoter creates business entities to shield a partnership's assets from third parties. Helba v. Commissioner, 87 T.C. at 1011.  Here, Fred manipulated a number of entities purportedly participating in the employee leasing programs in order to remove the participants' assets and liabilities from the channels of genuine commerce.  Beginning with MIT 83, Fred inserted Qulart, a shell corporation, into the investment and payment circles that occurred within the later employee leasing partnerships.  The stated purpose of Qulart was to prevent Machise from assigning the notes involved in the employee leasing operations to third parties.

Similarly, in 1986, Machise Personnel Co. (MPC), a partnership that was essentially Bucci's alter ego, acquired all of the financial assets of Machise (subject to related liabilities) previously generated by the yearly employee leasing agreements to which Machise had been a party.  Fred arranged this acquisition in order to reassure lenders and suppliers of Machise, who had questioned Machise's receivables and several million dollars of liabilities to the MIT 80, MIT 81, MIT 82, and MIT 83 partnerships.

Another new entity, a partnership named MITA, was formed on January 1, 1983.  Bucci had a 99-percent interest in MITA, and Intercoastal had the 1-percent balance.  MITA was formed to

prevent the lawsuit brought by Ingemi's widow, who was suing Bucci and his companies, from affecting the tax shelters.

The pervasive formation and use of these "barrier" entities in the employee leasing operations contributes to our conclusion that these operations, as structured by Fred, reflected efforts to avoid, rather than to embrace, economic reality.

A realistic review of the employee leasing transactions under the factors set forth above shows that the transactions were shams, lacking economic substance, existing only on paper, mostly in the form of book entries.  Respondent has properly denied the losses that resulted from the partnerships' claimed payments of compensation to Machise's employees and independent contractors.

B.    Lack of Profit Objective of the Employee Leasing Partnerships

The foregoing conclusion that the operations of the partnerships lacked economic substance is sufficient to justify denial of the deductions claimed by the partnerships.  Gardner v. Commissioner, 954 F.2d 836, 839 (2d Cir. 1992), affg. per curiam Fox v. Commissioner, T.C. Memo. 1988-570.  Nevertheless, we look at the lack of profit objective to provide further support for our conclusion.

The deductions that produced the claimed partnership losses at issue arose from the expenses of meeting the payroll costs of Machise.  Wages and salaries and other compensation paid to

service providers are deductible under section 162(a)(1), which allows a deduction for "expenses incurred in carrying on any trade or business, including * * * a reasonable allowance for salaries or other compensation for personal services actually rendered".

In Commissioner v. Groetzinger, 480 U.S. 23 (1987), the Supreme Court said that in order for a taxpayer to be in a trade or business, within the meaning of section 162, the "primary purpose" for engaging in the activity must be for profit. The Supreme Court stated:

> the taxpayer must be involved in the activity with continuity and regularity and * * * the taxpayer's primary purpose for engaging in the activity must be for income or profit. * * * [Id. at 35.]

The Court of Appeals for the Third Circuit has explained: "It is well established that in order to take a deduction for expenses incurred in carrying out a trade or business the taxpayer must have entered into the venture with the primary and predominant purpose and objective of making a profit." Simon v. Commissioner, 830 F.2d 499, 500 (3d Cir. 1987), affg. T.C. Memo. 1986-156. "While a reasonable expectation of profit is not essential, the profit motive must be bona fide." Id. (citing Fox v. Commissioner, 80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), Zemel v. Commissioner, 734 F.2d 9 (3d Cir. 1984), Rosenblatt v.

Commissioner, 734 F.2d 7 (3d Cir. 1984), Kratsa v. Commissioner, 734 F.2d 6 (3d Cir. 1984), Leffel v. Commissioner, 734 F.2d 6 (3d Cir. 1984), Hook v. Commissioner, 734 F.2d 5 (3d Cir. 1984)).

A determination of profit objective is to be made with reference to the actions and expectations of those individuals who manage the affairs of the partnership. Id. (citing Fox v. Commissioner, supra at 1007-1008).

This Court has recently discussed the nature of this for-profit test. See Peat Oil & Gas Associates v. Commissioner, 100 T.C. 271 (1993), affd. sub nom. Ferguson v. Commissioner, 29 F.3d 98 (2d Cir. 1994). In the cases at hand, whether the participants must have profit as their "primary purpose", or whether it suffices that they have an "actual and honest" profit objective, does not matter. They have shown neither.

The "subjective" test for business purpose--or profit objective--shares many characteristics with the "objective" economic substance test. McCrary v. Commissioner, 92 T.C. 827, 844 (1989). We have already discussed many of these characteristics in our consideration of economic substance; those considerations apply with equal force to our conclusion that the transactions at issue lacked business purpose and a profit objective.

The Court of Appeals for the Third Circuit has also explained:

Whether the partnership has the requisite profit

objective is an issue of fact which must be resolved by
examining the surrounding facts and circumstances. In
making this determination, greater weight should be
given to objective facts than to a mere declaration of
the taxpayer's intent.  The burden of proving the
requisite profit objective rests with the taxpayer.
[Simon v. Commissioner, supra at 501; citations
omitted.]

In these cases, the individual who in fact managed the

affairs of the partnerships was Fred, the principal of BBPA who

had structured the transactions.  His role was consistent with

BBPA's undertakings that it would manage the partnerships.

The "surrounding facts and circumstances" of Fred's

operations reveal the absence of a profit objective.  Fred

designed the partnerships not to produce a profit, but rather to

produce a loss.  His objective was not economic gain, but rather

tax avoidance.  Under Fred's plan, the partners of the

partnerships would have to wait as long as 11 years before they

could expect to see a profit.  Their only client--Machise--had

the option of waiting that long before paying the "compensation

fee".  During those years, the partners' only recourse was to

wait.

Moreover, the transactions were so structured that their

waiting would be in vain.  Fred eliminated any prospect for

partnership profits well before the partnerships had an

opportunity to collect them.  Fred, acting on his own initiative,

executed termination agreements for all the partnerships except

W & A, which he eliminated as a "mutual mistake".  These actions

guaranteed that the partners would never have a chance to earn a return on their investments.

Fred's actions are inconsistent with his claims that the partnerships had a profit objective. His deliberate postponement of profits, and his interposition of the termination agreements, show the absence of a profit objective.

It appears that changes in the tax law forced Fred's hand. Fred interpreted the Tax Reform Act of 1986 as requiring the partnerships to accrue currently and report the large amounts of phantom income that Fred's paper transactions had generated. In his view, the legislation thus created the likelihood that the partners would be required to pay taxes on income that they would never receive. The employee leasing schemes were thus no longer workable, and Fred had to terminate them.

Even if the Tax Reform Act of 1986 had not been enacted, we are convinced that Fred would have been required to come up with termination agreements, or something like them. As discussed supra pp. 122-126, there was no reasonable basis upon which to project profitable operations. Without the termination agreements (or their equivalents), the time would come when Machise would have to pay its debts. Beginning in 1991, Machise would be required to pay not only its current payroll costs, but also those obligations that had accumulated 11 years earlier in its employee leasing agreement with MIT 80. It would also owe 15 or 20 percent of these accumulated amounts as "overrides", and,

in the case of MIT 80 and MIT 82, it would also owe accumulated but unpaid interest.  Machise's burden would continue year after year, as its obligations to make multimillion-dollar payments to MIT 80, then to MIT 81, MIT 82, MIT 83, MIT 84, MIT 85, and MIT 86 became due, one after another.  It is difficult to believe that Machise could survive such economic burdens--indeed, Machise appears to have collapsed even before its repayment obligations arose.  If Machise did not survive, the parties would never recover their money, and as we have noted, matters could get even worse.  If Machise failed, its creditors might attempt to collect on the partners' notes to Machise.  Fred would then need the termination agreements, or something like them, to cancel the partners' notes to Machise before its creditors could try to collect.  Otherwise, as Fred feared, the investors might well be seriously displeased.  We therefore believe that Fred planned for the termination agreements, or their equivalent, at the outset of his employee leasing programs.

We recognize that Fred and Bruce provided the prospective investors with projected figures showing that, ideally, the partners stood to profit upon their investments in the partnerships.  These profits would come in the form of accrued compensation fees and late charges.  Fred has not provided any factual basis for assuming that these figures were realistic. The projections existed only in the abstract; they appear to be based only upon the hopeful notion that Machise would earn enough

to pay off its compensation fees and late fees and still stay in business.  We do not find such figures convincing.  They fall far short of being the fact-based realistic calculations demanded by profit-motivated investors before they place their money at risk.  Cf. Soriano v. Commissioner, 90 T.C. 44, 56-57 (1988).  Moreover, as we noted earlier, Fred extended his tax planning services to include eliminating liability for the income that the partnerships would report in their later years.  Such income was largely "phantom" income; it produced no gain but merely reflected the unwinding of the circular employee leasing structures.  Fred therefore undertook to preclude any liability of his clients for this noncash "compensation fee" or "late fee" income by the expedient of placing them in other tax shelters.

Moreover, neither Fred nor Bruce, nor any of the partners in the leasing partnerships, demonstrated even a remote knowledge of the fuel trucking industry in which their partnerships had allegedly invested several millions of dollars.  Although the partnerships were allegedly in the employee leasing business, Fred and Bruce did nothing to pursue a profit for those businesses.  They instead ceded to Machise all rights and responsibilities for hiring, assigning, paying and firing the allegedly leased employees and independent contractors.  "In sum, the * * * [managing] partners took absolutely no steps to protect or further the interests" of their partnerships.  Flowers v. Commissioner, 80 T.C. 914, 938 (1983).

The partnerships' history of cash expenditures further vitiates any notions of their business purposes. The cash flowing out of the leasing partnerships is not consistent with a profit-oriented business. The cash did not go directly to the trucking enterprise; instead it went to Fred's firm, BBPA. BBPA then split the investor cash with Machise, based upon the "line-of credit" notes, or, later, upon BBPA's sharing the cash after taking out its "promoters' fee". Moreover, when the "termination agreements" were signed, the cash stayed with BBPA or Machise; none was returned to the partners, with the apparent exception of Dr. Crescenzo.[37] The partners merely received bookkeeping credits against their notes. Here, as in Fox v. Commissioner, 80 T.C. 972, 1010 (1983), the record is devoid of evidence that the partners' investment--

> was in any way determined with a "true regard for the profitability of the activity." * * * The negotiations were conducted only with a view toward benefiting both the promoters (in cash) and potential * * * partners (in tax benefits). * * *

There is another characteristic frequently used in discerning a partnership's valid profit objectives, as opposed to its tax avoidance purposes. The courts have considered the experience of the partnerships' management in conducting the

---

[37]The facts, see supra p. 29, indicate that Dr. Crescenzo's recovery stemmed from a buyout of his partnership interest--by Fred and Bruce and Richard Adamucci--that appeared to be part of a global settlement that took Dr. Crescenzo out of all or most of his Bryen-promoted tax shelter interests.

partnerships' businesses, in comparison with the management's background in structuring and promoting tax shelters. Simon v. Commissioner, 830 F.2d 499 (3d Cir. 1987); see Seaman v. Commissioner, 84 T.C. 564, 589 (1985). Here, neither Fred nor Bruce has demonstrated any effective knowledge of either employee leasing or the fuel trucking industry. Fred and Bruce are, however, experienced accountants who have extensive backgrounds in structuring and promoting tax shelters. Their firm handled the tax reports and filings of all parties that participated in the employee leasing deals. We are convinced that Fred and Bruce were selling their clients tax savings, and nothing else of substance.

Some partners of these partnerships have testified that they were motivated to invest by the profits offered by Machise's oil trucking activities. However, the investors played essentially passive roles; in determining profit motivations, we look to the activities of Fred and Bruce, who managed the partnerships. Moreover, in determining the existence of a profit objective, we give greater weight to objective facts than to a taxpayer's statement of intent. Simon v. Commissioner, supra; Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); sec. 1.183-2(a), Income Tax Regs. The promoters and partners knew enough to stress at trial their personal hopes of great profits. Thus, while Fred urged them to "tell the truth", he also reminded the partners that their attorney "will expect

you to testify to the true facts that you knew that you were at risk for $137,500.00 and that you expected to earn 13% on your investment which would be more than enough to pay your note".

The entire record shows that any such hopes and expectations were without foundation.[38]

## II. The Pettisanis Are Not Entitled to Deductions for Interest Claimed on Their Long-Term Notes

In order for interest to be deductible under section 163(a), the underlying indebtedness must be genuine. Knetsch v. United States, 364 U.S. 361 (1960). The presence of deferred debt that is not likely to be paid is an indication of a lack of economic substance. Id.; Waddell v. Commissioner, 86 T.C. 848, 902 (1986), affd. per curiam 841 F.2d 264 (9th Cir. 1988); Estate of Baron v. Commissioner, 83 T.C. 542, 552-553 (1984), affd. 798 F.2d 65 (2d Cir. 1986). Therefore, where a debt transaction is not conducted at arm's length by two economically self-interested parties, or where a debt is incurred in "peculiar circumstances" indicating that it will not be paid, we have disregarded that

---

[38]The nonexclusive list of nine factors for determining the presence or absence of a profit motive listed in sec. 1.183-2(b), Income Tax Regs., has often been used for determining the presence or absence of a business purpose in an alleged sham. Hildebrand v. Commissioner, 28 F.3d 1024, 1027 (10th Cir. 1994), affg. Krause v. Commissioner, 99 T.C. 132 (1992); Smith v. Commissioner, 937 F.2d 1089, 1093 (6th Cir. 1991), revg. and remanding 91 T.C. 733 (1988); Campbell v. Commissioner, 868 F.2d 833, 836 (6th Cir. 1989), affg. in part, revg. in part, and remanding T.C. Memo. 1986-569. A detailed examination of these factors would result in a decision against petitioners. Factor (1) (manner in which taxpayer carries on the activity) in particular weighs heavily against petitioners.

debt for tax purposes.  See, e.g., <u>Bryant v. Commissioner</u>, 790
F.2d 1463, 1466 (9th Cir. 1986), affg. <u>Webber v. Commissioner</u>,
T.C. Memo. 1983-633; <u>Odend'hal v. Commissioner</u>, 80 T.C. 588, 604
(1983), affd. and remanded 748 F.2d 908 (4th Cir. 1984); <u>Lemmen
v. Commissioner</u>, 77 T.C. 1326, 1348 (1981); <u>Roe v. Commissioner</u>,
T.C. Memo. 1986-510, affd. without published opinion sub nom.
<u>Sincleair v. Commissioner</u>, 841 F.2d 394 (5th Cir. 1988).

In the presence of such peculiar circumstances, we examine
the substance of the debt and are not guided solely by its form.
<u>Waddell v. Commissioner</u>, <u>supra</u>.  We have therefore often refused
to give effect to notes that appear on their face to be recourse
notes, but that were unlikely ever to be enforced because of
surrounding circumstances.  See, e.g., <u>Waddell v. Commissioner</u>,
<u>supra</u>; <u>Helba v. Commissioner</u>, 87 T.C. at 1009-1011; <u>Houchins v.
Commissioner</u>, 79 T.C. 570, 599-603 (1982).[39]

The Pettisanis have claimed deductions for interest
allegedly paid on their long-term recourse notes to Machise, made
pursuant to their investment in the MIT 82 tax shelter.  In years
after 1982, Machise allegedly repaid the so-called advances from
MIT 82 by circling a note back through the partnership.  This
note was then deemed distributed to the partners and then applied

---

[39]Other instances in which we have refused to give effect to
allegedly recourse notes in similar tax-shelter situations occur,
for example, in <u>Fritz v. Commissioner</u>, T.C. Memo. 1991-176;
<u>Maultsby v. Commissioner</u>, T.C. Memo. 1989-659; <u>Diego Investors-IV
v. Commissioner</u>, T.C. Memo. 1989-630.

to make payments on the partners' 12-percent notes to Machise. Each year, BBPA treated some part of the partners' note payments to Machise as the partners' payment of interest. Frank and Lucille Pettisani accordingly claimed Schedule E interest expense deductions of $20,000, $18,921, $17,733, $16,427 and $21,697 on Frank Pettisani's investment in MIT 82 for the years 1983 through 1987, respectively. Respondent has disallowed these deductions as lacking economic substance.

We agree; respondent is correct. The congeries of factors that show the employee leasing transactions to be without economic substance similarly dispose of the interest deductions at issue. The alleged payments of interest were only a part of a prearranged plan devised by Fred. There was no independent third-party lender to whom the interest was owed. Fred's plan instead provided that Machise would be both the lender and the debtor in the same transaction. Thus, when Machise made payments on its debts to the partnerships, those payments circled back to it as the partners' payments, including interest, on their debts to Machise. There were no cash payments. Such repayments as were made took the form only of notes or bookkeeping entries. The Pettisanis' alleged payments of interest were thus only part of the paper circle of obligations. That circle gave the illusion of interest payments but lacked economic effect.

There was no possibility that the Pettisanis' notes would enter into the world of commercial reality. Commercial reality

might have intruded if Machise encountered financial difficulty, and its creditors undertook to collect those notes. Fred precluded collection of the notes by executing "termination agreements" on behalf of both the alleged debtors and lenders in the employee leasing agreements. He did so in order to "get rid of the risk" that the notes would ever be paid.

The Pettisanis' claimed interest payments are based upon a debt transaction that was not conducted at arm's length by two economically self-interested parties. Moreover, that debt is based upon "peculiar circumstances"--in particular offsetting transactions and the MIT 82 termination agreement--indicating that it would not be paid. For tax purposes, we therefore disregard that debt and the interest it allegedly generated. Respondent properly disallowed the interest deductions claimed by the Pettisanis.

III. <u>Intercoastal Is Not Entitled To Deduct From Its Income the Accrued Interest, Management Fees, or Override Payments to the Leasing Partnerships</u>

The final substantive question is whether Intercoastal, through its subsidiary Machise, was entitled to deduct amounts generated by its dealings with the partnerships. Once again, the factors that show the employee leasing transactions to be shams also apply to the Intercoastal/Machise deductions.

It is obvious that Machise was induced to participate in the employee leasing program by the promise of substantial tax benefits. In exchange for running its business normally, it

would pay 100 percent of its payroll costs, but accrue and deduct 115 (or 120) percent as payable to the partnerships. These accruals included the "override", plus interest accrued but never paid, plus "management fees", based upon amounts that the partnerships allegedly paid to Bucci, or to his alter ego MITA.

Machise accrued and deducted these amounts in excess of its basic payroll costs, but never paid them. The alleged payments occurred only in the form of offsetting bookkeeping entries and checks or notes that were integral parts of the money circles. The partnerships received no cash from these purported payments. Although the payments were designed to appear to be loan repayments, their effect was simply to complete the circle so that Machise could deduct amounts that it would never pay.

Additionally, the services for which Machise allegedly paid "overrides" did not bring about any economic consequence in the business conducted by Machise. They are thus without effect for tax purposes. See Haas v. Commissioner, 248 F.2d 487, 489 (2d Cir. 1957), remanding T.C. Memo. 1956-165. Although the partnerships allegedly undertook to provide employees and to save administrative and overhead costs for Machise, there were no such savings. Machise and its officers continued to bear the administrative costs. They kept and maintained records, decided whom to hire and fire, made work assignments, and decided about payments for the pension plan. They provided the money for the payroll costs. In terms of Machise's business, the partnerships

were nonentities.  The alleged payments of "overrides" to the partnerships lacked economic substance or a profit objective. Petitioners have failed to prove otherwise, and the deduction of these amounts by Machise/Intercoastal is properly denied.

Petitioners have also failed to establish any economic consequence or business purpose for the "management fees" paid by Machise to Intercoastal or to Bucci's alter ego, MIT Associates. Bucci and Ingemi, and then Bucci alone, ran the operations of Machise with no apparent regard to the execution of any "management agreement" by Machise.  They did so before execution of the employee leasing agreements, and they continued to do so afterward.

Petitioners have not demonstrated how much, if any, of the management fees at issue represented the actual cash compensation received by Bucci in his capacity as head of Machise.  Once again, the management fees appear to have taken the form of mere bookkeeping entries or uncashed checks, designed to lower Intercoastal/Machise's actual exposure to income taxes. Petitioners have failed to demonstrate that the management fees reflected economic substance, or that they were incurred with a profit objective.  Their deductions claimed for amounts in excess of basic payroll costs are properly denied.[40]

---

[40]Petitioners also complain that while respondent has disallowed payments made by Machise for management fees and overrides, respondent has not credited BBPA, or MITA, or Bucci with the income reported by them from such transactions.  The

Petitioners' claims and arguments in support of Intercoastal/Machise's deductions of interest lack the specifics needed to make a detailed analysis. Respondent claims that the disallowed interest is that paid by Machise on its notes to the investors or to Qulart, plus that paid upon Machise's line-of-credit borrowings from BBPA. Petitioners state that there was no interest paid on Machise's notes to the investors or to Qulart; the interest at issue related only to the line-of-credit loans from BBPA. On brief, neither party asserts that the "late fees" payable on the postponed compensation fees are implicated (the disallowed interest deductions for the fiscal years ending in 1982 through 1986 were substantial, leading us to believe that more than the letter-of-credit interest is at issue). In any event, petitioners have not shown that the accrual and deduction of interest payments by Machise reflected economic substance.

The interest claimed as deductions by Machise in the employee leasing transactions was only "paid" pursuant to obligations in the repayment circle of notes and journal entries that made up the employee leasing financial structure. Machise paid no cash in the form of such interest; instead it accrued these amounts only as part of the repayment circle. Any payment took the form of offsets that circled from Machise to BBPA, or to the partnerships, to the partners, and then back to Machise. As

obvious response to this complaint is that the tax liabilities of BBPA, MITA, and Bucci are not now before us.

with all other purported debts in the employee leasing circles, the interest is based upon purported loan transactions that were not conducted at arm's length by independent parties.  Moreover, those debts are affected by "peculiar circumstances"--here, Fred's unrestricted ability to set off and cancel loan agreements--that indicate that the debts would not be paid.  The deduction of the interest is properly denied.[41]

IV.  The Transactions at Issue Are Not Recognized for Purposes of Claiming Deductions or Reporting Income

A.  In Summary

In these cases, Fred designed circular programs of offsetting obligations.  For tax purposes, he treated these obligations as commercially valid independent transactions.  For economic purposes, however, he treated them as self-canceling transactions.  The tax characteristics of a transaction must reflect the economic reality of that transaction.  We have found that these transactions had neither economic substance nor a profit objective.  On the basis of the legal principles discussed above, we hold that they had no tax effects.  It follows that respondent's disallowances of the claimed deductions are sustained.

---

[41]Fred has also argued that some part of the payments of "overrides" constituted the payment of interest by Machise.  As stated, see supra note 31, those overrides are illusory and are not to be given effect for tax purposes.

B.  No Procedural Defense to Determined Deficiencies

Petitioners have asserted a number of procedural defenses to the determined deficiencies and adjustments, but none of these defenses is well founded.

We do not consider persuasive, or even relevant, the fact that respondent may have accepted without protest earlier filings from the partnerships.  It is well settled that the Commissioner's prior determinations do not relieve a taxpayer of its burden of proving error in the Commissioner's current determination.  Coors v. Commissioner, 60 T.C. 368, 406 (1973), affd. 519 F.2d 1280 (10th Cir. 1975).

Petitioners also claim that statutory developments have removed respondent's authority to disallow deductions for the years at issue.  They argue that Congress has instead provided a different arrangement in section 448(d)(7).  That provision was enacted as part of the Tax Reform Act of 1986, Pub. L. 99-514, sec. 801(a), 100 Stat. 2345.  It requires a tax shelter to report taxable income on the basis of a phased-in change from the cash method to the accrual method, beginning in 1987.  Petitioners argue that they complied with this provision.  They conclude that respondent contravened this provision and acted without authority in disallowing the partnerships' cash basis deduction of employee leasing costs for years prior to 1987.  Petitioners assume too much.  In enacting section 448(d)(7), Congress did not cancel the threshold requirement that only substantive transactions will be

given effect for tax purposes.  The Court of Appeals for the Third Circuit has recently stated that "economic substance is a prerequisite to any Code provisions allowing deductions."  United States v. Wexler, 31 F.3d at 124 (quoting Lerman v. Commissioner, 939 F.2d at 52).  There is no indication that Congress, in forbidding tax shelters' use of cash accounting methods after 1986, intended to validate earlier sham transactions, such as those at issue.  Cf. Knetsch v. United States, 364 U.S. at 369.

We reject as frivolous another procedural argument advanced by petitioners.  They allege that respondent has accepted certain partnership returns, most notably that of MIT 82 in 1985, a year in which MIT 82 reported substantial taxable income.  Petitioners then argue that respondent has violated a duty of consistency.  Specifically, they charge respondent with failure to propose adjustments to those returns, and to eliminate the reported income because it arises from a sham transaction.  Respondent's lack of consistency, petitioners conclude, works a retroactive quasi-estoppel.  This estoppel bars respondent's defense of the asserted deficiencies arising from MIT 82's alleged activities in the taxable years properly before the Court.

Petitioners have cited no authority that supports this quasi-estoppel argument,[42] nor have they established its factual

---

[42]Petitioners' brief on this point refers to the provisions of the unified partnership proceedings under secs. 6221-6233 and dicta from this Court's opinion in Roberts v. Commissioner, 94

predicate. Respondent has not violated any duty of consistency. To the contrary, respondent, having become aware of the facts of petitioners' situation, has consistently maintained that the partnerships and their transactions are shams.

Petitioners have not shown that respondent's actions in any way prevented them from filing administrative adjustment requests for the years in which the partnerships reported income. In rejecting a similar estoppel argument, we have stated:

> We need only comment that there was no fraud, concealment, misrepresentation, omission, negligence, violation of duty, or unfair conduct on the part of respondent. * * * This being the case, we cannot say that petitioners were misled or actually relied upon any representation or omission of the respondent. [Saigh v. Commissioner, 36 T.C. 395, 423 (1961).]

See Herrington v. Commissioner, 854 F.2d 755 (5th Cir. 1988), affg. Glass v. Commissioner, 87 T.C. 1087 (1986); 15 Mertens, Law of Federal Income Taxation, sec. 60.05, at 19-23 (1989).

Moreover, the doctrine of consistency does not impose an affirmative duty upon respondent to stay on the lookout, and to analyze for error, petitioners' returns for years later than those in issue. If the underlying transactions were shams, and the income was not properly reported in earlier years, it was petitioners' responsibility to file corrective administrative adjustment requests under section 6227. Petitioners have filed

---

T.C. 853, 860 (1990). Petitioners' citation of these authorities in this context stretches them far beyond any reasonable application.

several such requests in these consolidated proceedings; these requests show that Fred and Bruce understand the procedures for protecting the interests of their clients.

Followed to its logical end, petitioners' quasi-estoppel argument would yield absurd results. Petitioners' argument, simply put, is that because they did not protect their interests for some of the partnerships' later years, respondent has the responsibility to do so for them under the "doctrine of consistency". Therefore, petitioners' own failure to file requests for administrative adjustments would estop respondent from defending asserted deficiencies or adjustments for the years properly before the Court. Petitioners have offered no authority to support an argument so bizarre, and we decline to accept it.

Nevertheless, it is clear that the partnerships' requested administrative adjustments for some of the income-reporting years should be granted, as respondent has conceded. If the transactions are shams for purposes of tax deductions, they are shams for purposes of reporting taxable income. Sheldon v. Commissioner, 94 T.C. at 753. "If a transaction is devoid of economic substance * * * it simply is not recognized for federal taxation purposes, for better or for worse." Lerman v. Commissioner, 939 F.2d at 45. Respondent has conceded that, if we determine the partnerships are shams that are not entitled to deduct losses for their prior years, it would be appropriate to

give effect to the requested adjustments eliminating income reported for the later years. Respondent's concession should not be affected by the fact that, while we did not determine the partnerships themselves to be shams, we have determined that their transactions were shams.

Petitioners in the "Fred Bryen Promotions" series of cases who have signed "piggyback agreements" should be treated similarly. Because the transactions were shams, it follows that these petitioners did not receive taxable income from those transactions. The amounts received through the transactions that we have determined to lack economic substance or a business purpose must therefore be subtracted from the taxable income reported by those partners for the years at issue, and their partnerships' taxable income thereby reduced. See Arrowhead Mountain Getaway, Ltd. v. Commissioner, T.C. Memo. 1995-54.

Respondent's opening brief lists those years that are open and subject to adjustment for purposes of eliminating income reported. Petitioners' reply brief asserts that respondent's list omits 2 such years. This is the sort of administrative matter that the parties should resolve during the Rule 155 process. We urge them to do so.

In the same vein, Machise/Intercoastal has made another point that we believe to be correct. For the years at issue, it urges that, if it may not deduct the interest at issue, neither

should it be charged with the corresponding interest income or other income reported, but not actually received as a result of the sham transactions with the partnerships.  This again is a matter for administrative adjustment by the parties.

    C.  <u>No Need To Address Other Issues</u>

As noted above, the Court of Appeals for the Third Circuit has recently stated that "economic substance is a <u>prerequisite</u> to <u>any</u> Code provisions allowing deductions."  <u>United States v. Wexler</u>, 31 F.3d at 124 (citing <u>Lerman v. Commissioner</u>, <u>supra</u>). Here, the parties have raised other issues, some of them highly technical.  In view of the pervasive lack of economic substance in the transactions before us, we need not and do not address them.

To reflect the foregoing,

<u>An appropriate order will be issued</u>.